REDFERN v SPARKS-WITHINGTON COMPANY

PASTALENIEC v THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC

LEGUT v DETROIT WINDOW CLEANING COMPANY

Docket Nos. 54947, 55329, 56190, 56352. Argued December 3, 1975
(Calendar Nos. 7-10).—Decided July 17, 1978.

The workers in these cases claim total and permanent disability
workmen's compensation benefits for mental and cognitive
dysfunctions caused by work-related physical injuries.

Anna Redfern was injured at work in 1953 and was awarded
workmen's compensation benefits against Sparks-Withington
Company for a permanent disability caused by a neurosis or
conversion hysteria. 353 Mich 286; 91 NW2d 516 (1958). In
1968 plaintiff claimed total and permanent disability benefits
for an incurable mental dysfunction and in 1973 the Work-
men's Compensation Appeal Board awarded benefits from the
Second Injury Fund. The Court of Appeals, Danhof, P.J., and
Quinn and McGregor, JJ., denied leave to appeal (Docket Nos.
16637, 16667). Defendant Second Injury Fund appeals.

Joseph Pastaleniec claimed workmen's compensation benefits
against the Great Atlantic & Pacific Tea Company, Inc., for a
psychological condition resulting in permanent and total dis-
ability. Expert witnesses testified that the plaintiff's passive
mental state was a pre-existing condition when he obtained
employment with A & P, and that an injury at work provided
him with an excuse for living a passive life and discontinuing
his employment. The Workmen's Compensation Appeal Board

REFERENCES FOR POINTS IN HEADNOTES

[1, 6–8, 11] 41 Am Jur 2d, Incompetent Persons §§ 1, 2.
[2–5, 9, 12, 13] 82 Am Jur 2d, Workmen's Compensation §§ 240-243,
301, 302, 340.
[3, 5, 10, 13] 82 Am Jur 2d, Workmen's Compensation §§ 338, 347,
348.
[4, 6, 7] 82 Am Jur 2d, Workmen's Compensation §§ 350, 351.
[11, 13] 82 Am Jur 2d, Workmen's Compensation § 537.
[12, 13] 82 Am Jur 2d, Workmen's Compensation §§ 550, 561, 562.
[13] 82 Am Jur 2d, Workmen's Compensation §§ 613-616.

awarded him benefits for total and permanent disability. He died, and his wife, Lucille, the executrix of his estate, was substituted as plaintiff. The Court of Appeals, Fitzgerald, P.J., and V. J. Brennan and O'Hara, JJ., affirmed (Docket No. 14960). Defendants A & P and Second Injury Fund appeal.

Walter L. Legut claimed workmen's compensation benefits against Detroit Window Cleaning Company, Michigan State Accident Fund, and the Second Injury Fund for work-related injuries and incurable mental retardation caused when he fell several stories and landed on concrete. The Workmen's Compensation Appeal Board found that the plaintiff had not shown by a rating on the Stanford-Binet test that he was suffering from imbecility or that he was incurably insane under the terms of the statute. The Court of Appeals, Bashara, P.J., and Bronson and Carland, JJ., reversed and remanded to the Workmen's Compensation Appeal Board for further proceedings on the ground that the Stanford-Binet intelligence test is not the exclusive test for determining mental retardation (Docket No. 17707). Plaintiff Legut and defendant Detroit Window Cleaning Company appeal.

In an opinion by Justice Levin, with the Chief Justice and Justice Williams concurring, it was *held:*

1. Legal definitions of mental illness or incapacity developed for other purposes, *e.g.,* criminal law, civil commitment, testamentary or contractual capacity, would not serve the legislative purpose of workmen's compensation. Nor should medical definitions be determinative: "insanity" is a legal term which doctors relate to their own terminology with varying and sometimes opposing definitions; there is no consensus. A worker may recover total and permanent disability benefits for incurable insanity if his incapacity is attributable to work-related mental illness expected to be of long duration.

2. Under the Worker's Disability Compensation Act there are two broad categories of benefits: general disability benefits and scheduled benefits for specific losses. General disability benefits are awarded for a loss of wage-earning capacity even if there is no specific medical loss. However, with the exception of the "loss of *industrial use*" of limbs, scheduled benefits are awarded for specific medical losses without regard to whether there is a reduction of wage-earning capacity. "Incurable insanity or imbecility" is listed as a specific loss which is deemed a total and permanent disability.

3. It would not be consonant with the design of the act to regard wage-earning capacity as determinative of entitlement to total and permanent disability benefits for mental illness or

incapacity and not for the other enumerated losses. Loss of mental function or a cognitive loss constituting "incurable insanity or imbecility" has a severe effect on the worker's personal life without regard to whether it affects his wage-earning capacity. Therefore, a person suffering work-related incurable mental illness or cognitive impairment of comparable severity may recover total and permanent disability benefits whether or not his wage-earning capacity is affected.

4. Mental and cognitive functions are not readily measured and the severity of loss that satisfies the statutory standard is not subject to precise description. However, the legislative purpose was to provide compensation for severe mental impairment which is comparable in its impact on the quality of the personal, nonvocational life of the worker to the loss of two limbs or the sight of both eyes. Where there is no such severe impairment of the quality of life, total and permanent disability benefits may not be awarded even if the mental illness or cognitive loss deprives the worker of wage-earning capacity. Further definitions of the terms "severe", "comparable", and "quality of life" will be better evolved in the administrative and judicial decision of individual cases, including the instant cases on remand.

5. The central definitional question in these cases concerns the severity of mental dysfunction that will be regarded as satisfying the statutory standard. Derangement, personality disintegration, or inability to recognize or cope with reality may constitute the requisite dysfunction, but it also may be established by other evidence of severe social dysfunction in significant nonvocational activity having an impact on the quality of life comparable to the loss of limbs or of sight. A worker's mental illness is "insanity" if he suffers severe social dysfunction and his intellectual impairment is "imbecility" if he suffers severe cognitive dysfunction. The dysfunction is "incurable" if it is unlikely that normal functioning can be restored.

6. Plaintiff Legut's inability to learn or perform tasks except the simplest kind because of his work-related injury may constitute a permanent and total disability if there is the requisite impact on his personal life. But that is for the Workmen's Compensation Appeal Board to decide in the first instance. Furthermore, if he does recover on that basis, it should not be understood that only such evidence establishes a sufficiently "severe" cognitive dysfunction.

7. A worker, therefore, can recover total and permanent disability benefits for an incurable mental dysfunction if he has

a severe mental or emotional illness or a cognitive loss which is work-related and is likely to be of long and indefinite duration. The Court makes no attempt at this time, however, to identify behavioral evidence that proves "incurable insanity or imbecility".

Justice Coleman, joined by Justice Fitzgerald, concurring in part, agreed that wage-earning capacity should not be *determinative* of whether a worker suffers total and permanent disability from "incurable insanity or imbecility", at least during the first 800 weeks, but it may be considered among other facts relevant to the claimed psychiatric disability. The approach of the Court to defining "insanity" and "imbecility" disavows the criteria and terminology commonly employed by the medical and legal professions and substitutes an amorphous concept (to be developed in subsequent opinions) which focuses upon non-occupational "quality of life". The Court has also decided that a "severe *social* dysfunction" is causally connected to employment if the claimant imagines or hallucinates ("honestly perceives") the connection. The result is to create more interpretation problems than are solved and to expand unduly the statutory language. These legal terms require medical facts to establish their existence. There are so many variables to either state that any single definition is predestined to compound the confusion. Use of any presently acceptable terminology could not withstand the inevitable changes in medical science and statutory law. The evidence should establish that the mental illness or handicap is of a truly catastrophic nature and that the condition is "incurable" before benefits may be awarded. Expert testimony is most important. Consideration may also be given to the claimant's wage-earning capacity and the claimant's ability to function "normally" in a non-occupational setting. There should be no restrictive definitions of "insanity" or "imbecility", but the finder of fact should be left to make a determination from testimony according to the state of medical science at the time of the hearing and other facts pertinent to the claim.

Justice Fitzgerald did not participate in the decision in *Pastaleniec.*

Justices Ryan and Blair Moody, Jr., did not participate in any of the cases.

The cases are remanded to the Workmen's Compensation Appeal Board for further consideration. The issue in *Pastaleniec* of whether the dysfunction is work-related is to be decided

under the standards set forth in *Deziel v Difco Laboratories, Inc (After Remand)*, 403 Mich 1 (1978).

*Sprute v Herlihy Mid-Continent Co*, 32 Mich App 574; 189 NW2d 89 (1971), overruled in part.

OPINION OF THE COURT

1. WORKMEN'S COMPENSATION—TOTAL DISABILITY—WORDS AND PHRASES—INSANITY.

Definitions of mental dysfunctions which were developed for the areas of criminal law, civil commitment, or testamentary or contractual capacity, would not serve the legislative purpose of the Worker's Disability Compensation Act in defining "incurable insanity and imbecility" nor should medical definitions be determinative because "insanity" is a legal term which doctors relate to their own terminology with varying and sometimes opposing definitions (MCL 418.361[2]; MSA 17.237[361][2]).

2. WORKMEN'S COMPENSATION—TOTAL DISABILITY—MENTAL DYSFUNCTION.

A worker may recover total and permanent disability benefits for an incurable mental incapacity if the dysfunction is work-related and expected to be of long duration; however, the impairment of the worker's processes need not be totally disabling to the extent that it precludes gainful employment (MCL 418.361[2]; MSA 17.237[361][2]).

3. WORKMEN'S COMPENSATION—TOTAL DISABILITY—MENTAL DYSFUNCTION.

It would not be consonant with the design of the Worker's Disability Compensation Act to regard wage-earning capacity as determinative of entitlement to total and permanent disability benefits for incurable mental dysfunction where the act provides that scheduled benefits for all other specific medical losses, except those designated as "industrial use" losses, are payable without regard to wage-earning capacity (MCL 418.361[2]; MSA 17.237[361][2].)

4. WORKMEN'S COMPENSATION—TOTAL DISABILITY—MENTAL DYSFUNCTION.

A worker suffering work-related mental illness or cognitive impairment of comparable severity in its effect on the quality of the worker's personal life, apart from wage-earning capacity, to a loss of both eyes or two limbs, may recover total and permanent disability benefits (MCL 418.361[2]; MSA 17.237[361][2]).

5. WORKMEN'S COMPENSATION—TOTAL DISABILITY—MENTAL DYSFUNC-
   TION.

   Total and permanent disability benefits, other than general dis-
   ability benefits, may not be awarded for a mental illness or
   cognitive loss, if the mental dysfunction only deprives the
   worker of wage-earning capacity but does not severely impair
   the quality of his nonvocational life (MCL 418.361[2]; MSA
   17.237[361] [2]).

6. WORKMEN'S COMPENSATION—TOTAL DISABILITY—MENTAL DYSFUNC-
   TION—EVIDENCE.

   Derangement, personality disintegration, or inability to recognize
   or cope with reality may constitute the requisite mental dys-
   function to entitle a worker to total and permanent disability
   benefits for "incurable insanity or imbecility", but this may be
   established by other evidence of severe social dysfunction in
   significant nonvocational activity having an impact on the
   quality of life comparable to the loss of limbs or of sight (MCL
   418.361[2]; MSA 17.237[361] [2]).

7. WORKMEN'S COMPENSATION—TOTAL DISABILITY—INCURABLE IMBE-
   CILITY—EVIDENCE.

   A worker's inability to learn or perform tasks except the simplest
   kind because of a work-related injury may constitute a perma-
   nent and total disability under the Worker's Disability Com-
   pensation Act if the impact on the worker's personal life is
   comparable to the loss of two limbs or the sight of both eyes;
   however, it should not be understood that only such evidence
   establishes imbecility (MCL 418.361[2]; MSA 17.237[361] [2]).

8. WORKMEN'S COMPENSATION—TOTAL DISABILITY—MENTAL DYSFUNC-
   TION—INSANITY—IMBECILITY—WORDS AND PHRASES.

   A worker's mental illness is "insanity" under the Worker's
   Disability Compensation Act if he suffers severe social dysfunc-
   tion and his intellectual impairment is "imbecility" if he suffers
   severe cognitive dysfunction (MCL 418.361[2]; MSA
   17.237[361] [2]).

9. WORKMEN'S COMPENSATION—TOTAL DISABILITY—MENTAL DYSFUNC-
   TION—INCURABILITY—WORDS AND PHRASES.

   A mental dysfunction is "incurable" under the Worker's Disabil-
   ity Compensation Act if it is unlikely that normal functioning
   can be restored (MCL 418.361[2]; MSA 17.237[361] [2]).

OPINION CONCURRING IN PART AND DISSENTING IN
PART BY COLEMAN, J.

FITZGERALD, J.

10. WORKMEN'S COMPENSATION—TOTAL DISABILITY—MENTAL DYS-
    FUNCTION—WAGE EARNING CAPACITY.

*Wage-earning capacity should not be determinative of a claim for
workmen's compensation benefits for total and permanent dis-
ability from "incurable insanity or imbecility", at least during
the first 800 weeks, but it may be considered among other facts
relevant to the claimed psychiatric disability (MCL
418.361[2][f]; MSA 17.237[361][2][f]).*

11. WORKMEN'S COMPENSATION—INSANITY—IMBECILITY—WORDS AND
    PHRASES.

*"Insanity" and "imbecility" are legal terms which require medi-
cal facts to establish their existence.*

12. WORKMEN'S COMPENSATION—TOTAL DISABILITY—MENTAL DYS-
    FUNCTION—QUESTION OF FACT.

*The evidence to support a finding that a workmen's compensation
claimant is entitled to total disability benefits for insanity or
imbecility should establish that the mental illness or handicap
is of a truly catastrophic nature and that the condition is
"incurable" (MCL 418.361[2][f]; MSA 17.237[361][2][f]).*

13. WORKMEN'S COMPENSATION—TOTAL DISABILITY—MENTAL DYS-
    FUNCTION—QUESTION OF FACT—PROOFS.

*The Workmen's Compensation Appeal Board and its referees
have the fact-finding duty to assess and weigh all the evidence
and make findings whether a claimant is incurably insane or
imbecilic; expert testimony is most important, but considera-
tion may also be given to the claimant's wage-earning capacity,
his ability to function "normally" in a non-occupational setting,
and other facts pertinent to the claim (MCL 418.361[2][f]; MSA
17.237[361][2][f]).*

*L. R. Heuman (Rappleye, Bannasch & Wilkins,*
by *John P. Kobrin, Jr.,* of counsel), for plaintiff
Redfern.

*Kelman, Loria, Downing, Schneider & Simpson*
(by *George L. Downing* and *Robert W. Howes)* for
plaintiffs Pastaleniec and Legut.

*Conklin, Benham, McLeod, Ducey & Ottaway,*
*P.C.* (by *Thomas P. Chuhran),* for defendants
Sparks-Withington Company and American Motor-
ists Insurance Company.

*Frank J. Kelley*, Attorney General, *Robert A. Derengoski*, Solicitor General, and *A. C. Stoddard* and *Thomas R. Fredericks*, Assistants Attorney General, for defendant Second Injury Fund.

*Lacey & Jones* (by *Hayim I. Gross)* for defendant The Great Atlantic & Pacific Tea Company, Inc.

*Vandeveer, Garzia, Tonkin, Kerr & Heaphy, P.C.* (by *James A. Sullivan),* for defendants Detroit Window Cleaning Company and Michigan State Accident Fund.

LEVIN, J. Anna Redfern, Joseph Pastaleniec and Walter L. Legut suffered work-related injuries, and compensation for general disability was paid.

In these cases, consolidated on appeal, the workers asserted that as a consequence of their physical injuries they suffered mental illness or cognitive loss constituting "incurable insanity or imbecility" and, therefore, additional compensation should be paid for "total and permanent disability".[1]

---

[1] Before 1954 total and permanent disability benefits were payable for the statutorily enumerated losses, 1948 CL 412.10; MSA 17.160, and, additionally, for other losses determined on their facts to constitute total and permanent disability. See *Edwards v Michigan Light Alloys Corp,* 346 Mich 169; 77 NW2d 569 (1957) (imbecility as a total and permanent disability in fact); *Springer v Reed Foundry & Machine Co,* 346 Mich 11; 77 NW2d 252 (1956) (insanity as a total and permanent disability in fact).

In 1954 the statute was amended to confine total and permanent disability to those losses specifically enumerated in the statute. 1954 PA 175; 1948 CL 412.10; MSA 17.160. See *Hier v Boichot Concrete Products Corp,* 379 Mich 605, 611-612; 153 NW2d 753 (1967); *Liesinger v Owen-Ames-Kimball Co,* 377 Mich 158, 164; 139 NW2d 706 (1966); *Verberg v Simplicity Pattern Co,* 357 Mich 636; 99 NW2d 508 (1959); *Lockwood v Continental Motors Corp,* 27 Mich App 597, 600-601; 183 NW2d 807 (1970).

The statute now provides:

"Total and permanent disability, compensation for which is provided in section 351 means:

"(a) Total and permanent loss of sight of both eyes.

"(b) Loss of both legs or both feet at or above the ankle.

The facts and history of the litigation are set forth in fns 2-4.

The Workers' Compensation Appeal Board declared that

—while in its judgment Redfern's mental illness did not constitute "incurable insanity", it was obliged by *Sprute v Herlihy Mid-Continent Co,* 32 Mich App 574; 189 NW2d 89 (1971), to find that she was incurably insane and to award compensation for total and permanent disability;[2]

"(c) Loss of both arms or both hands at or above the wrist.

"(d) Loss of any 2 of the members or faculties enumerated in (a), (b) or (c).

"(e) Permanent and complete paralysis of both legs or both arms or of 1 leg and 1 arm.

"(f) Incurable insanity or imbecility.

"(g) Permanent and total loss of industrial use of both legs or both hands or both arms or 1 leg and 1 arm; for the purpose of this subdivision such permanency shall be determined not less than 30 days before the expiration of 500 weeks from the date of injury." MCL 418.361(2); MSA 17.237(361)(2).

In 1955 the act was amended to provide total and permanent benefits for the duration of the disability with a conclusive presumption of such disability for 800 weeks. 1955 PA 250; 1948 CL 412.9; MSA 17.159.

[2] Redfern suffered a work-related injury on January 23, 1953 when a weight fell and hit her between the shoulder blades causing minor physical injuries. She claimed workers' compensation benefits on the ground that she had developed a conversion hysteria precipitated by her physical injury which disabled her from working and was awarded 750 weeks of benefits for total and permanent disability *in fact. Redfern v Sparks-Withington Co,* 353 Mich 286; 91 NW2d 516 (1958).

In January, 1968 she petitioned for total and permanent disability benefits under the "incurable insanity" provision.

Redfern testified that she is unable to work because she tires easily and her legs give out. She manages her own financial affairs, takes care of her pets and does her own light housekeeping.

Redfern was referred to a psychiatrist to determine whether she qualified for governmental assistance. That psychiatrist, who interviewed her briefly on one occasion, testified that she had a "neurotic depressive reaction with somatic manifestations" of arm and back pains. She is not dangerous, delusional or hallucinatory. She is capable of managing her affairs, is oriented as to time and place and aware of her financial problems and these problems are a cause of her anxiety and depression. There was no other psychiatric testimony.

The referee found Redfern not insane. The WCAB expressed agree-

—Pastaleniec's "condition meets" the *Sprute* definition of incurable insanity;[3]

ment with his decision but reversed because of *Sprute v Herlihy Mid-Continent Co*, 32 Mich App 574; 189 NW2d 89 (1971). 1973 WCABO 216. The Court of Appeals denied leave to appeal.

Unless Redfern is deemed "incurably insane" she is not entitled to further benefits from her employer or differential benefits from the Second Injury Fund. *See Liesinger v Owen-Ames-Kimball Co, supra.*

[3] Pastaleniec was a plumber for 25 years when, in 1960, due to his employer's bad health, the business was discontinued. Pastaleniec then took an unskilled job at A & P. In March, 1963 he was transferred to another job at A & P. On March 28, 1963 a ramp fell and hit Pastaleniec on the back. At the time of the accident he was nearly 46. Voluntary compensation was paid until March 12, 1966. Pastaleniec then filed a claim for total and permanent diability benefits claiming incurable insanity.

Pastaleniec said he was "shook up" and nervous at the time of the accident. He had not missed a day of work as a plumber or while working for A & P until the day of the accident. He returned to work on April 14, 1963 and worked that day and one hour the following day. He then said he was unable to work because his back hurt, went home and never again worked.

Following the accident Pastaleniec began to drink heavily and was hospitalized for his drinking problem.

Pastaleniec lived with his wife and mother. After the accident they gave him alcohol rubs morning and evening. His wife said that he had become nervous and was easily upset, occasionally becoming so depressed that he did not talk. He did little more than watch television and read. They used to go on fishing trips and participate in other social activities but since the accident their social life had become virtually non-existent.

Pastaleniec's and A & P's psychiatrists agreed that he had psychological problems before the accident. They opined that Pastaleniec had looked on his plumber employer as a surrogate father and, after the employer's death, refused to work as a plumber as part of the mourning process. They said that the accident was an excuse for Pastaleniec not to work; however, both said that Pastaleniec was not malingering and that his discomforts were real.

Pastaleniec's witness examined him on two occasions, approximately two years apart. He said that Pastaleniec complained of weakness, pain, insomnia and impotence. He described him as an obsessive compulsive personality who, subsequent to the death of his employer, had gradually become intermittently psychotic, meaning "that during periods, perhaps, of especially severe discomfort his ability to distinguish fantasy from reality is grossly impaired". He said that in his opinion the accident "created a focus for the already existent depression" and aggravated Pastaleniec's psychological problems. Pastaleniec believed he would feel better if he worked but was unable to do so.

A & P's witness also examined Pastaleniec on two occasions approx-

—although in its judgment Legut was incurably insane, he did not qualify under the *Sprute* definition; and that his cognitive loss did not constitute imbecility.[4]

imately two years apart. Pastaleniec made complaints similar to those made to his expert witness. A & P's witness described Pastaleniec as having a latent psychotic reaction, meaning that he has the "potential for the flaring up or breaking out of overt psychotic symptoms." He said that Pastaleniec had an "intense passive striving to be taken care of" and "has a somewhat peculiar distorted view of reality when it comes to the work situation". The accident "was of no significant consequence in producing [Pastaleniec's] borderline psychotic reaction".

The referee found Pastaleniec's mental condition to be work-related. His "psychotic condition equates with insanity" and "[t]he likelihood of improvement is * * * slim". He awarded Pastaleniec total and permanent disability benefits for incurable insanity.

Pastaleniec died during the pendency of the appeal to the WCAB. His wife, as administratrix of his estate, was substituted.

The WCAB affirmed the referee's decision. It found Pastaleniec's condition met the *Sprute* test and that his disability was work-related. The Court of Appeals affirmed. 49 Mich App 702; 212 NW2d 734 (1973).

A & P contends that Pastaleniec's pre-existing psychological disorder, not the accident at work, was the cause of his disability. That issue is controlled by this Court's decision in the companion case of *Deziel v Difco Laboratories, Inc (After Remand)*, 403 Mich 1; 268 NW2d 1 (1978).

[4] Legut grew up on a farm and quit school after the eighth grade to work. He maintained steady employment with construction firms, the United States Army, as a bakery route salesman and through apprenticeship to journeyman window cleaner at which trade he worked for a number of years.

On March 6, 1964 he fell from a scaffold and fractured his skull. He remained in a semi-comatose state for about four days. At the time he was 42.

Benefits were voluntarily paid until May 2, 1964. Legut obtained employment, and filed a claim for total and permanent disability for incurable insanity and imbecility.

After returning from the hospital, Legut began to exhibit behavioral changes. As time went on the changes increased qualitatively and quantitatively.

Legut went for months without bathing. He began to drink excessively. He became violent toward his wife and children while sober or drunk. He was easily upset, often for no apparent reason. With counseling, his wife learned to understand the nature of his deficiencies, and the violent spells decreased.

Legut has severe and frequent headaches. He has to be told what clothing to wear and when to eat and bathe or he will not do so. If he is not given a shopping or banking list he forgets what to do.

At the time of hearing, Legut was working as a conveyor loader. He said he had tried to operate a press, but that he could not remember the buttons to push and had cut off part of his thumb.

Since the accident, Legut's social life has radically changed. He no longer participates in bowling leagues or goes to sporting events or socializes with other people. He drives only to and from work because he has no interest in going anywhere.

His wife and children have enormous difficulty communicating with him. His wife and daughter testified that he talks in circles and becomes frustrated because he cannot express himself.

At one time Legut had plans to establish his own window washing business and had practiced keeping records and books on the job. These plans were abandoned after the accident.

The three doctors who testified at the hearing agreed that he has organic brain syndrome, is unable to think abstractly, and that the condition is probably permanent. The three doctors asked Legut to relate similarities of certain objects. Legut said that an orange and a banana are alike because an orange is round and a banana is long, and an elephant and a fly are alike because one is big and one is small. Legut's witnesses said that he is unable to cope and understand beyond simple concrete situations. The employer's witness said that Legut is not totally unable to conceptualize similarities, but that his ability is limited to the lowest form of similarities, *e.g.*, that an orange and an apple are both round.

Legut's psychiatrist said that Legut has organic brain syndrome with psychosis. In all probability the "etiology of this organic brain syndrome began with that accident that occurred in '64 * * * " and "since has disintegrated and gone downhill".

The employer's psychiatrist's diagnosis was depressive neurosis, organic brain syndrome without psychosis, and borderline mental retardation. The accident did cause brain damage, but Legut was probably borderline retarded before the accident.

Legut's clinical psychologist rated him as mentally defective to borderline normal intelligence. None of his abilities are above the borderline level. "He is completely unable to conceptualize abstractly" and is only able to function in simple situations involving concrete objects. She said that a six-year-old is able to conceptualize that oranges and bananas are similar in that they are both fruits.

She further testified that she concluded Legut was previously of average intelligence because he exhibited "old learning" and because he had been accepted into the Army. She also said that "[h]is day to day functioning is probably even less adequate than his obtained I.Q. suggests" because of his "old learning". He is unable to go beyond present and immediate objects and make inferences about them, and cannot remember new material and learn new associations. She said that he becomes confused under minimal stress to the point of becoming unable to function. "Mr. Legut's relatively intact, if somewhat slowed, ability to recall old learned material and his adequate orientation in space in time probably mask his severe limitation in any new or abstract situation. He can function with apparent adequacy; however, only if the situation is familiar and structured, and

The WCAB found for Redfern because although she seemed able to function normally away from work, her mental illness, as expressed in *Sprute*, "totally disabled" her from working. It found against Legut, even though it said his case was most appealing,[5] because he was working and thus not "disabled".[6]

he is not asked to deal with abstract ideas or new concepts. This means that he would have to be employed in a job requiring repetitive behavior and no initiative; and it is likely that he finds it more comfortable to be at work rather than to enter into social conversation. Except when the conversation deals with the weather or the time of day, Mr. Legut is unable to hold his own. He would be an extremely unsatisfactory social companion for a social group comprised of people of average intelligence."

She said that under the Stanford-Binet test an I.Q. of 50 is considered imbecilic. She rated Legut at a 73 I.Q. on the basis of other tests. "The old imbecility rating was based on the Stanford-Binet which is used extremely rarely for adults and rarely, actually, for children above seven." The term "imbecility" is passé and no longer used by psychologists.

The referee found that Legut was injured in the course of his employment but was not totally and permanently disabled.

The WCAB affirmed the referee. It found that Legut did not meet his burden of proving imbecility because he was not rated on the Stanford-Binet test and that Legut was gainfully employed and therefore not incurably insane under *Sprute*. See fns 5-7, *infra*.

The Court of Appeals held that the Stanford-Binet test should not be the sole basis for determining imbecility and remanded to the WCAB to reconsider the question of imbecility, See fn 7, *infra*. The Court of Appeals affirmed the WCAB's finding that Legut was not incurably insane. 54 Mich App 404; 221 NW2d 232 (1974).

Before reconsideration by the WCAB we granted leave to appeal to Legut and the defendants.

[5] "Rarely does this board see a more deserving plaintiff before it seeking the benefits of the act—yet the undersigned regretfully submit the present state of law is such that the referee was correct in his denial of benefits.

"The excerpts from this record noted in the prior opinion by Member Storie vividly outline plaintiff's injury and resultant loss in mental acuity. We agree with Member Storie that such loss is akin to the other 'specific losses' for which compensation was intended to be paid regardless of wages earned." *Legut v Detroit Window Cleaning Co*, 1973 WCABO 1547, 1571.

[6] "As to insanity, a decision on first impression would undoubtedly find this drastically-limited employee so afflicted. Yet the insurmountable obstacle here is *Sprute v Herlihy Mid-Continent Co*, 32 Mich App 574:

" 'An employee is incurably insane under [MCL 412.10(b)(6); MSA

In *Pastaleniec,* there is an additional issue, whether the claimed mental illness was caused by the work injury. The companion case of *Deziel v Difco Laboratories, Inc (After Remand),* 403 Mich 1; 268 NW2d 1 (1978), controls that issue.

We hold that the Court of Appeals did not, in *Sprute,* correctly define the term "incurable insanity", and that the WCAB's definition, in *Legut,* of "imbecility" is also incorrect.[7] Our conclusions are

17.160(b)(6)] if the occupational illness which impairs the employee's mental processes is of totally disabling proportions and is likely to be of long and indefinite duration, thus making gainful employment impossible.'

"This plaintiff is working in a limited, but productive industrial job today, precluding a finding of disability 'of totally disabling proportions—making gainful employment impossible.'

"This writer has commented previously on the possible inadequacy of the *Sprute* test in *Redfern v Sparks-Withington,* 1973 WCABO 216. There, as here, the unprecedented use of plaintiff's work status as a measurement in determining permanent and total disability produced disatisfactory results. There, a plaintiff that three of four participating board members felt not entitled, was *granted* [emphasis in original] compensation as permanently and totally disabled based on *Sprute.* Here, a much more severely-limited plaintiff must be denied based on the same *Sprute.*

"As the Court in *Miller v Sullivan Milk Products, Inc,* 385 Mich 659 [189 NW2d 304 (1971)]:

" 'A review of specific loss cases reveals that loss of "industrial use" is a question of fact. The test of that fact has been to equate such a loss with the physical or anatomical loss of use of a member of the body rather than with an economic reality test. See *Shumate v American Stamping Co,* 357 Mich 689 [99 NW2d 374] (1959), [et al.]'

"Yet we must currently be guided by *Sprute,* the Court of Appeals most recent pronouncement on insanity in workmen's compensation, even though it introduces an 'economic reality' factor into this lone category of specific loss. Thus, finding plaintiff employed and applying *Sprute,* we here rule plaintiff not to be permanently and totally disabled as defined." *Id.,* pp 1571-1572.

7 The WCAB declared in *Legut:*

" * * * While the term may be outmoded or behind 'the constantly changing nomenclature used by the practitioner of the medical arts', it *is* the term used in the act. The testimony of this record reveals it to be a term based on measurement in the Stanford-Binet intelligence test for persons testing between 20-50. This plaintiff was tested at 73 on the Wechsler test, which Doctor Jean S. Braun could not translate into Stanford-Binet scores. Imbecility is not proven—a burden not met by plaintiff." *Id.,* p 1571.

The Court of Appeals responded:

stated in the penultimate paragraph of this opin- ·
ion. We remand to the WCAB for further consider-
ation of all three cases in light of this opinion and,
in *Pastaleniec,* of the *Deziel* opinion.

I

We seek definitions of insanity and imbecility
that serve the policies of the Worker's Disability
Compensation Act.

We agree with the Court of Appeals, in *Sprute,*
that definitions of insanity developed for other
purposes, *e.g.,* in the areas of criminal law, civil
commitment, testamentary or contractual capac-
ity, would not serve the legislative purpose. Nor do
we think that medical definitions should be deter-
minative. Insanity is a legal term which doctors
relate to their own terminology with varying and
sometimes opposing definitions; there is no consen-
sus.

Before *Sprute* was decided, the WCAB declared
that a worker is "insane" when his injury "affects

"Plaintiff correctly states that the Stanford-Binet test has not been
designated by the Legislature or the courts as the exclusive test to be
used in determining imbecility. The Stanford-Binet is, of course, one
available indicator, but other recognized tests are being used which
should be considered, when offered, by referees and the Workmen's
Compensation Appeal Board. Plaintiff's experts employed the Ror-
schach, Bender-Gestalt, and Wechsler tests to evaluate plaintiff's
intelligence. The results of these tests and the testimony of plaintiff's
experts showed that plaintiff was rated either an imbecile or was in a
category very close to being one. The opinion of the board that
plaintiff's inability to translate the test results into the Stanford-Binet
scale, with the subsequent finding that he failed to meet his burden of
proof, was prejudicial error. This Court is unable to say that a
different finding would have been made had the board considered the
plaintiff's proffered tests. However, the fact that the board makes it
clear that it would only consider the Stanford-Binet test requires a
reversal by this Court and a new finding on the question of imbecility.
The determination will be a factual question for the board to decide
after reviewing all the evidence and scrutinizing intelligence tests
offered by the parties involved." *Legut v Detroit Window Cleaning Co,*
54 Mich App 404, 406-407; 221 NW2d 232 (1974).

or destroys his mental capacity to the degree that he is deranged and unfit to be employed because of the unreliability of his behavior with concomitant danger to himself and others". *Borg v Fisher Body Division of General Motors,* 1969 WCABO 1246, 1258.

In *Sprute* the Court of Appeals declared that the WCAB's *Borg* test was "too restrictive" and specifically rejected the operative phrase "because of the unreliability of his behavior with concomitant danger to himself and others". The Court, in partial agreement with the WCAB, declared that the test should be "consistent with the basic principle that the employee's disabling condition makes him unfit for employment. Such a test would be designed to permit the fact finder to allow compensation only when the injury has affected the employee's mental capacity to the extent that it *precludes him from gainful employment".* *Sprute v Herlihy Mid-Continent Co, supra,* pp 578-579 (emphasis supplied).

The Court then stated a test which has been applied in subsequent cases, including the three cases now before us:

"An employee is incurably insane under MCL 412.10(b)(6); MSA 17.160(b)(6), if the occupationally-related mental or emotional illness which impairs the employee's mental processes is of totally disabling proportions and is likely to be of long and indefinite duration, thus making gainful employment impossible." *Sprute v Herlihy Mid-Continent Co, supra,* p 579.[8]

---

[8] In reasoning to this conclusion, the Court said:

"Clearly, incurable insanity would include persons who are required to be institutionalized and removed from society as the result of their work-related injury. Contrariwise, we do not believe that the legislature would intend that an employee suffering from nervous indigestion should be considered incurably insane under MCL 412.10(b)(6); MSA 17.160(b)(6). As pointed out in the *Borg* opinion, it is the gray area between these extremes to which a workable test must address itself." *Sprute v Herlihy Mid-Continent Co, supra,* p 579.

*Sprute* says, in effect, that a worker can recover total and permanent disability benefits for incurable insanity if

(1) he has a mental or emotional illness,

(2) the illness is work related,

(3) the impairment of his mental processes is of totally disabling proportions,

(4) it is likely to be of long and indefinite duration, and

(5) gainful employment is impossible.

We accept criteria 1, 2 and 4; the incapacity must be attributable to work-related mental illness expected to be of long duration. We do not accept criteria 3 and 5, requiring that the impairment of mental processes be totally disabling[9] precluding gainful employment.

## II

There are two broad categories of workers' compensation benefits: scheduled benefits and general disability benefits.[10] Scheduled benefits are awarded for specific medical losses without regard to whether there is a reduction of wage earning capacity;[11] in general they are payable for permanent loss of a specific anatomical member or function, *e.g.,* a foot, hand, sight in one eye. General disability benefits are awarded for a loss of wage

---

[9] In context it appears that the Court of Appeals intended that "totally disabling" mean totally disabled from working, and that is the meaning which has been given those words in subsequent cases.

[10] See *Miller v Sullivan Milk Products, Inc,* 385 Mich 659, 666; 189 NW2d 304 (1971); *Hutsko v Chrysler Corp,* 381 Mich 99, 102; 158 NW2d 874 (1968).

[11] MCL 418.361; MSA 17.237(361); *Miller v Sullivan Milk Products, Inc, supra; Hutsko v Chrysler Corp, supra; Liesinger v Owen-Ames-Kimball Co, supra,* p 165, fn 6; *Lindsay v Glennie Industries, Inc,* 379 Mich 573, 578; 153 NW2d 642 (1967). See also 2 Larson, Workmen's Compensation Law, § 58.11, pp 10-164–10-169.

earning capacity even if there is no *specific* medical loss.[12]

Devastating specific losses enumerated in the statute, *e.g.*, both legs or sight of both eyes, are deemed a "total and permanent disability".[13] "Incurable insanity or imbecility" is so enumerated.

*Sprute* and *Borg* both make "unfitness" for employment a precondition to qualification for total and permanent disability benefits.

With the exception, however, of a distinctive category, "loss of *industrial use*" of limbs, added to the total and permanent disability definition after its original formulation,[14] entitlement to compensation for total and permanent disability does not depend on whether the loss affects wage earning capacity.

Since scheduled benefits for all specific losses, major or relatively minor, are payable without regard to loss of wage earning capacity, except for the distinctive and atypical "industrial use" loss, it would not be consonant with the design of the act to regard wage earning capacity as determinative of entitlement to total and permanent disability benefits for incurable insanity and imbecility alone.

Just as a sightless or legless worker may recover total and permanent disability benefits for work-caused loss of both legs or sight without regard to whether there is or continues to be any effect on

---

[12] MCL 418.351; MSA 17.237(351); *Sims v R D Brooks, Inc*, 389 Mich 91; 204 NW2d 139 (1973); *Miller v Sullivan Milk Products, Inc, supra,* pp 665-666; *Hutsko v Chrysler Corp, supra,* p 102.

[13] Michigan's total and permanent disability definition is apparently unique and is regarded as fundamentally a medical loss definition. See 2 Larson, *supra,* § 57.10, fns 11 & 12, pp 10–12, 10–13.

[14] In 1956 the act was amended to add loss of industrial use as the seventh category of total and permanent disability. 1956 PA 195; 1948 CL 412.10; MSA 17.160; presently MCL 418.361(2); MSA 17.237(361)(2).

his wage earning capacity, so too a person suffering work-related mental illness or cognitive impairment of comparable severity may recover such benefits whether or not his wage earning capacity is affected.

All the specific losses affect the quality of life apart from wage earning capacity. A person who suffers the loss of an anatomical member or sight in one eye is impaired in his ability to function normally in everyday life even though there may be no effect on his wage earning capacity. If he loses two members (both legs, both arms, or a leg and an arm) or sight of both eyes, the impairment of normal function and the effect on the worker's personal life is serious.

Loss of mental function or a cognitive loss constituting "incurable insanity or imbecility" has a similar severe affect on the worker's personal life without regard to whether it affects his wage earning capacity.

Mental and cognitive functions are not readily measured. The severity of loss that satisfies the statutory standard is not subject to precise description.

We are persuaded that the legislative purpose was to provide compensation for severe mental illness or cognitive loss comparable in its impact on the quality of the personal, nonvocational life of the worker to the loss of two members or sight of both eyes, the other permanent and total disability categories in the original formulation of the present total and permanent disability provisions. (See fn 1 for text.) Such a loss may also affect the worker's wage earning capacity, but that is not determinative.[15]

---

[15] A worker whose mental processes are so damaged that he suffers severe social dysfunction in significant non-vocational activity or

A worker who suffers such a severe work-related mental illness or cognitive loss is entitled to total and permanent disability benefits. Where there is no such severe impairment of the quality of life, total and permanent disability benefits, separate and apart from general disability benefits, may not be awarded even if the mental illness or cognitive loss deprives the worker of wage earning capacity.

Before the act was amended in 1965 to require payment of benefits for the duration of a general disability,[16] benefits were not required to be paid beyond 500 weeks unless the worker suffered a total and permanent disability. Necessarily, many workers who suffered serious general disabilities not deemed "total and permanent" were limited to 500 weeks of compensation.

Some persons who before the 1965 amendment suffered work-related mental illness without severe impairment of the quality of life but who as a consequence are unable to work may be in greater need of compensation than a person who is able to work and whose "only" loss is personal or social. Nevertheless it would be disconsonant with the design of the act, absent specific legislative directive (e.g., the particularized "industrial use" definition), to treat a disability which may not severely

---

severe cognitive dysfunction will often be fully or partially disabled from gainful employment.

While evidence of dysfunction in employment is not determinative of eligibility for total and permanent disability benefits it may supplement evidence of non-employment dysfunction.

Contrariwise, evidence that a worker is able to function satisfactorily in a work relationship may negative severe mental illness or cognitive loss.

Where the dysfunction affects wage earning capacity the benefits compensate for both the impact on the worker's personal life and on his wage earning capacity. Cf. 2 Larson, supra, § 58.11, p 10-168, and compare with Lindsay v Glennie Industries, Inc, supra, p 578.

[16] Borg v Fisher Body Division, 1969 WCABO 1246, 1258, quoted in Part I, supra.

affect the quality of the worker's personal life as a
total and permanent disability.

## III

We are mindful of the imprecision of "severe",
"comparable", and "quality of life", but neverthe-
less have concluded that it is better that further
definition evolve in the administrative and judicial
decision of individual cases, including these cases
on remand.

We have considered the suggestions that we
equate the legal term "insanity" with the medical
term "psychosis". There is however, no consensus
regarding the meaning of that medical term. What
one doctor will describe as latent psychosis an-
other will describe as borderline psychosis or inter-
mittent psychosis or even severe neurosis. Medical
definitions change through the years, new terms
are added, and, old terms are modified or super-
seded. The terms "derangement"[17] and "reality"[18]
have varying meanings. Moreover, the Legislature
did not use medical terminology.

Definitions of insanity developed in other areas
of the law are not helpful. A worker may know
right from wrong (a criminal test), but be unable
to function in a normal social setting, just as there
are criminally insane persons who for long periods
of time function normally in society. Similarly, a
person may have the mental capacity to stand
trial, to contract, to execute a will, and yet be
unable to function in normal society or vice versa.
While for purposes of involuntary commitment,
evidence of danger to himself and others (an as-
pect of the *Borg* test) may be an appropriate test

[17] Some medical definitions of psychosis turn on the extent of the
patient's departure from "reality".

[18] See fn 7, *supra.*

and clearly would indicate severe social dysfunction, it is too restrictive for the purposes of the act to require evidence that the mental illness poses a risk of physical harm.

The central definitional question in these cases concerns the severity of dysfunction that will be regarded as satisfying the statutory standard. Derangement, personality disintegration, inability to recognize or cope with reality, may constitute the requisite dysfunction, but it also may be established by other evidence of severe social dysfunction in significant non-vocational activity having an impact on the quality of life comparable to the loss of limbs or of sight.

Cognitive dysfunction may be so severe, comparable to loss of limbs or of sight, even if tests developed for young children show the worker—possibly because of retained learning—to be above the level deemed to indicate imbecility in children.[19]

Legut urges that where the worker is unable to learn or perform tasks except the simplest kinds he is imbecilic. We are wary of tests and formulations, whether related or unrelated to the facts of a particular case. Legut's inability to learn or perform tasks except the simplest kind may indeed constitute imbecility if there is the requisite impact on his personal life, but in the first instance that is for the WCAB to decide. And if Legut recovers on that basis it should not be understood that only such evidence establishes imbecility.

Similarly we make no attempt at this time to identify behavioral evidence that indicates severe social dysfunction constituting incurable insanity.[20]

---

[19] See fn 4, *supra.*

[20] In these consolidated cases the issue is the severity or work-relatedness of the worker's condition and not whether it constitutes mental illness. While there is, therefore, no need to define "mental

We conclude that a worker's mental illness is "insanity" if he suffers severe social dysfunction and that a worker's intellectual impairment is "imbecility" if he suffers severe cognitive dysfunction. Social or cognitive dysfunction is "severe" if it affects the quality of the worker's personal, non-vocational life in significant activity comparably to the loss of two members or sight of both eyes, and is incurable if it is unlikely that normal functioning can be restored. The question whether the mental illness or intellectual impairment is work-related is to be decided in accordance with *Deziel v Difco Laboratories, Inc (After Remand),* 403 Mich 1; 268 NW2d 1 (1978).

Remanded to the Workers' Compensation Appeal Board for further consideration in light of this opinion and, in *Pastaleniec,* of *Deziel, supra.* We do not retain jurisdiction.

KAVANAGH, C.J., and WILLIAMS, J., concurred with LEVIN, J.

COLEMAN, J. *(concurring in part, dissenting in part).* Leave to appeal was granted in these cases to resolve one of the most vexatious problems of interpretation presented by the Worker's Disability Compensation Act of 1969: What are the determinative factors in ruling whether a worker qualifies for benefits statutorily provided for those suffering "total and permanent disability" from "incurable insanity or imbecility" within the context of MCL 418.361(2)(f); MSA 17.237(361)(2)(f).[1]

---

illness", we note that an organic disorder affecting the brain or nervous system and resulting in physical manifestations, *e.g.,* epilepsy, would not necessarily constitute "mental illness" or give rise to "social dysfunction".

[1] "(2) Total and permanent disability, compensation for which is provided in section 351 means:

"(a) Total and permanent loss of sight of both eyes.

"(b) Loss of both legs or both feet at or above the ankle.

In each case, the Workmen's Compensation Appeal Board (WCAB) applied the test set forth in *Sprute v Herlihy Mid-Continent Co,* 32 Mich App 574; 189 NW2d 89 (1971):

"An employee is incurably insane * * * if the occupationally-related mental or emotional illness which impairs the employee's mental processes is of totally disabling proportions and is likely to be of long and indefinite duration, thus making gainful employment impossible." (Footnote omitted.)

Wage-earning capacity was found to be determinative.

The majority today rejects *Sprute* in part and finds wage-earning capacity not to be determinative. We also would reject the *Sprute* test and agree that wage-earning capacity should not be determinative of MCL 418.361(2) injuries, at least during the first 800 weeks.[2] Nevertheless, it may be considered among other facts relevant to the claimed psychiatric disability.

However, we cannot subscribe to the admittedly imprecise and all-encompassing definitions of "insanity" and "imbecility".

The majority opinion says:

"We conclude that a worker's mental illness is 'insan-

"(c) Loss of both arms or both hands at or above the wrist.

"(d) Loss of any 2 of the members or faculties enumerated in (a), (b) or (c).

"(e) Permanent and complete paralysis of both legs or both arms or of 1 leg and 1 arm.

"(f) Incurable insanity or imbecility."

[2] "The conclusive presumption of total and permanent disability shall not extend beyond 800 weeks from the date of injury and thereafter the question of permanent and total disability shall be determined in accordance with the fact, as the fact may be at that time." MCL 418.351; MSA 17.237(351).

ity' if he suffers severe social dysfunction and that a
worker's intellectual impairment is 'imbecility' if he
suffers severe cognitive dysfunction. Social or cognitive
dysfunction is 'severe' if it affects the quality of the
worker's personal, non-vocational life in significant ac-
tivity comparably to the loss of two members or sight of
both eyes, and is incurable if it is unlikely that normal
functioning can be restored."

This approach disavows the criteria and termi-
nology commonly employed by the medical and
legal professions and substitutes an amorphous
concept (to be developed in subsequent opinions)
which focuses upon non-occupational "quality of
life".

The decision also must be examined in light of
the test for determining causal nexus to employ-
ment as adopted in today's *Deziel* cases.[3] The
combined result of these cases is that if one imag-
ines/hallucinates ("honestly perceives") that one's
work is the cause of a "severe social or cognitive
dysfunction", that perception is conclusive even if
it is not true. Total and permanent disability is
established and a minimum of 800 weeks compen-
sation is automatic and not reviewable during that
time.

From the two decisions of today, we must recog-
nize the flow of an immeasurably broadened and
even more uncertain concept of compensable,
work-connected injuries.

I

A short summary in pertinent part of each of
the three cases follows. All had been paid general
disability compensation but subsequently filed

---

[3] *Deziel v Difco Laboratories, Inc (After Remand)*, 403 Mich 1; 268
NW2d 1 (1978).

claims for total and permanent disability under
MCL 418.361(2)(f); MSA 17.237(361)(2)(f).

*Anna Redfern*

Plaintiff was paid general disability compensa-
tion for 750 weeks after she suffered a minor
injury at work. On January 8, 1968, she claimed
total and permanent disability by reason of incura-
ble insanity caused by the incident at work. She
says she suffers from anxiety and sometimes she
has arm and back pains. She is not delusional,
hallucinatory or dangerous. She is well oriented
and capable of managing her own affairs. The only
psychiatrist to testify said she had a "neurotic
depressive reaction with somatic manifestations".

The WCAB expressed the opinion that she was
not insane, not "incurably insane", nor an imbe-
cile, but felt obliged under the *Sprute* test to find
her so because she was psychologically unfit for
employment. The Court of Appeals denied leave to
appeal.

*Joseph Pastaleniec*

Plaintiff was a plumber and worked for the
same man for 25 years. When his employer died,
plaintiff refused to work again as a plumber be-
cause, the psychiatrists agreed, he had looked
upon the employer as a surrogate father. His
refusal to seek employment again in the plumbing
industry was viewed by the psychiatrists as a self-
imposed, pathological form of mourning.

Plaintiff then worked for about two years for A
& P in a salvage operation and was fortunate
enough to find a protective foreman with whom he
could form another "surrogate father" relation-

ship. He then was transferred to other work by A & P where he did not like his foreman. Only days after the transfer he fell from a ramp in what was termed a "trivial" incident. Plaintiff was X-rayed, but no physical damage was revealed. He worked one day and one hour after returning to work and never returned again.

The examining psychiatrists were in general agreement that plaintiff was a person with an extreme passive striving who sought a way of life in which he would be cared for by his wife and mother. He had lived all his life with his mother (excepting for a stint in the army). Even after a late marriage, he and his wife lived with his mother.

The psychiatrists agreed that these strivings and associated mental status long antedated his employment with defendant. Plaintiff's psychiatrist said the death of plaintiff's long-time plumber-employer "pulled the rug out from under him" and "[t]hen the obsessive-compulsive way of life crumbled under him and he could no longer carry out his work [plumbing]". He felt depressed but found a job at a "reduced status" where he again could be "protected". When he had to leave that work and that foreman, he became a "sitting duck" for the kind of injury sustained.

The injury at A & P, trivial as it was, afforded a convenient excuse to justify living a passive, dependent life.

Since leaving work, plaintiff was occasionally hospitalized for alcoholism, once by the probate court. He had cirrhosis of the liver. He was not again employed and died during the pendency of this case. His wife has been substituted for plaintiff as the executrix of his estate.

The referee found plaintiff to have been incur-

ably insane under the *Sprute* test. The WCAB affirmed. The Court of Appeals affirmed.

*Walter L. Legut*

Plaintiff was working as a journeyman window cleaner when he fell from a scaffold and fractured his skull (March 6, 1964). He was paid benefits until May 2, 1964 when he returned to work for the principal defendant. In March 1966 he commenced work at Chrysler Corporation at $3.57 an hour. (He previously had been earning $113 per week.)

The record indicates that plaintiff suffered from depression, dizziness, headaches and emotional instability following his accident. His memory had become so poor he could not remember which buttons to push when running a machine. After he had cut off part of his thumb at Chrysler, he had been transferred to work as a conveyer loader. His wife testified that she gave him lists of things to purchase or do. He had to be told what clothes to wear and what to eat. She also testified that he could no longer express himself and "talks in circles". Plaintiff's daughter testified to Mr. Legut's change of behavior. Jean S. Braun, Ph.D., a clinical psychologist, found plaintiff to test between mentally defective and borderline. Plaintiff's and defendant's psychiatrists diagnosed an "organic brain syndrome". Defendant's psychiatrist found plaintiff to be of borderline mentality. A neurosurgeon testified for defendant State Accident Fund that plaintiff was suffering from a "residual of quite a severe head injury" and that he "could not operate complex machinery, even of a moderate degree of sophistication".

However, plaintiff was working in a "limited, but productive industrial job", so the board found

he did not qualify for "total and permanent" disability under *Sprute.*

Plaintiff at first, on May 5, 1968, filed a petition for compensation based on "incurable imbecility" and later amended it to include "incurable insanity".

Both the referee and WCAB denied benefits applying the *Sprute* test. Chairman Gillman wrote for the WCAB:

"Rarely does this board see a more deserving plaintiff before it seeking the benefits of the act." 1973 WCABO 1547, 1571.

However, the state of the law under *Sprute* precluded § 361(2)(f) compensation. WCAB also found he did not meet the burden of proof.

The Court of Appeals reversed and remanded for a determination of whether plaintiff was an imbecile. It said:

"Plaintiff's experts employed the Rorschach, Bender-Gestalt, and Wechsler tests to evaluate plaintiff's intelligence. * * * The opinion of the board that plaintiff's inability to translate the test results into the Stanford-Binet scale, with the subsequent finding that he failed to meet his burden of proof, was prejudicial error." 54 Mich App 404, 406; 221 NW2d 232 (1974).

It also applied the *Sprute* test.

## II

After considerable study and reflection, we are convinced that the majority's attempt to define precisely what constitutes the state of "incurable insanity or imbecility" creates more interpretation problems than it solves. In addition, it unduly expands the statutory language.

Implicit in the decision should be the recognition that "insanity" and "imbecility" are legal terms which require medical facts to establish their existence. There are so many variables possible to either mental state that any single definition is predestined to compound the confusion as to each.

Were we to write a definition for posterity, utilization of presently acceptable terminology could not withstand the inevitable changes in medical science and statutory law resulting from new discoveries or perceptions. The same result obtains from the majority's attempts to define these terms without using medical terminology.

The Court's introduction of definitional language different from any statutory or medical concept (*i.e.,* "severe social dysfunction", "severe cognitive dysfunction", "quality of life", "significant activity" and "comparable to [a physical disability]") is no solution to the interpretation problem of the fact finder. To the contrary, it only adds to the burden.

Although we would not impose a precise definition, some guidance is warranted. To support a finding that a claimant is insane or imbecilic, the evidence should establish that the mental illness or mental handicap is ·of a truly *catastrophic* nature. Furthermore, a finding of entitlement to total and permanent disability benefits requires proof that the condition is "incurable". It is important to note that incurability is no idle requirement but is further indication that the evidence must establish a catastrophic and irreversible condition before benefits may be awarded under § 361(2)(f).[4]

---

[4] It should be noted that the state of medical science at this time is such that even committable mental patients (excepting patients such as those with a disease of the brain or a progressive organic disease affecting the nervous system) often are able to function "normally" after treatment and/or upon some medication.

The fact-finding duties are in the able hands of the referees and WCAB. They are to assess and weigh all the evidence and make findings as to whether the claimant is incurably insane or imbecilic. Expert testimony is most important. Consideration may be given also to the claimant's wage-earning capacity, but, as we said in rejecting the *Sprute* test, such evidence is not determinative in and of itself. The claimant's ability to function "normally" in a non-occupational setting is also relevant, although in and of itself it should not be determinative. In the final analysis, however, the decision regarding entitlement to total and permanent disability benefits belongs to the finder of fact. We are legally bound to rely on that judgment and not disturb it absent fraud or errors of law.

## SUMMARY

The combined impact of this majority opinion plus that of the *Deziel* triad of cases also released today is to lower the legislative standards entitling a claimant to a minimum of almost 16 years of unreviewable workmen's compensation for worthy and unworthy alike. It is an undue and unnecessary burden upon other workers and consumers.

Under these opinions, if a person is found to have a "severe *social* dysfunction" (emphasis added) which he or she imagines/hallucinates ("honestly perceives") is causally connected to employment, *even if this is not true,* that person may be adjudged "incurably insane" under § 361(2)(f). The employer thereby is liable for at least 800 weeks of compensation for total and permanent disability.

For instance, a simple neurosis too comfortable

to be abandoned could be viewed as work-related "incurable insanity" under this definition. Considering the nature of "insanity" or, in the *Deziel* cases, of neurosis, we must acknowledge reality to be elusive to and even avoided or unrecognized by the claimants.

In the same manner, if a person is found to have a "severe cognitive dysfunction" imagined to be work-related *(even if not so),* that person may be found entitled to a minimum 800 weeks of compensation.

These are concepts of work-related incurable insanity or imbecility which have grown neither from the medical nor the legal profession. Also, it is unlikely that the opinions reflect, even obliquely, the legislative intent at the time of the statute's passage.

However, we do agree that the capacity to work should not be determinative of total and permanent disability, although it may be considered with other facts.

We would impose no restrictive definition of "insanity" or "imbecility" but would leave the fact finder flexible to make a determination from medical testimony according to the state of the medical science as of the time of the hearing plus other facts pertinent to the claim.

Part II reflects some guidelines which, among others, should be considered in a determination of "incurable insanity or imbecility".

We would reverse and remand.

FITZGERALD, J., concurred with COLEMAN, J., except as to *Pastaleniec,* in which he took no part.

RYAN and BLAIR MOODY, JR., JJ., took no part in the decision of these cases.