LINCOLN v GENERAL MOTORS CORPORATION

Docket No. 204560. Submitted April 9, 1998, at Detroit. Decided August 21, 1998, at 9:00 A.M. Leave to appeal sought.

Arthur L. Lincoln sustained a work-related injury in 1966 while employed by General Motors Corporation and was awarded total and permanent worker's compensation benefits. He continued to receive benefits from General Motors and the Second Injury Fund after the expiration of the eight hundred-week statutory period of presumed disability. He reached the age of sixty-five in 1981. In 1985, the fund reduced Lincoln's differential benefits to twenty-five percent of the state's average weekly wage pursuant to *Lopez v Flower Basket Nursery*, 122 Mich App 680 (1982). The fund further reduced the benefits to recoup the overpayment of benefits in the previous twelve months. Lincoln did not timely challenge these reductions. He thereafter filed an application seeking reinstatement of the reduced benefits pursuant to *Wozniak v General Motors Corp*, 198 Mich App 172 (1993) (*Wozniak I*). A magistrate concluded that the employer and the fund were entitled to continue to take the age sixty-five reduction pursuant to *Rotondi v Chrysler Corp*, 200 Mich App 368 (1993), but did not reach the other issues presented. The Worker's Compensation Appellate Commission (WCAC) affirmed the magistrate's reliance on *Rotondi* and noted that the plaintiff's benefits could not be reduced below the minimum level established by MCL 418.351(2); MSA 17.237(351)(2). The WCAC observed that pursuant to *Wozniak v General Motors Corp (After Remand)*, 212 Mich App 40 (1995) (*Wozniak II*), the one-year-back rule, MCL 418.833(1); MSA 17.237(833)(1), does not apply to limit recovery of any underpayments in violation of subsection 351(2). The Court of Appeals denied the fund's application for leave to appeal in an unpublished order entered September 11, 1996 (Docket No. 194191). The Supreme Court, in lieu of granting leave to appeal, remanded the matter to the Court of Appeals for consideration as on leave granted of the issue whether *Wozniak I* is retroactive in favor of those who did not object to the reduction in benefits made pursuant to *Lopez*. 455 Mich 852 (1997).

On remand, the Court of Appeals *held*:

1. The *Lopez* panel sanctioned the application of the age sixty-five reduction in benefits set forth in MCL 418.357(1); MSA

17.237(357)(1) to employees who reached the age of sixty-five after July 1, 1968. *Wozniak I* concluded that *Lopez* was wrongly decided and that the minimum-benefit provision in subsection 351(2) was not affected by the age sixty-five reduction. *Wozniak I* held that for totally and permanently disabled workers whose date of injury precedes July 1, 1968, the age sixty-five reduction in subsection 357(1) cannot reduce the worker's benefit below the minimum established by subsection 351(2).

2. The Supreme Court has made exceptions to the general rule that judicial decisions are given complete retroactive effect, while legislative changes are usually prospective, where the Court has issued decisions that have an effect similar to the announcement of a new rule of law.

3. A court, to resolve the retroactive-prospective dilemma, must weigh the purpose to be served by the new rule, the extent of reliance on the old rule, and the effect of retroactivity on the administration of justice.

4. Retroactive application of *Wozniak I* is mandated in this case. The purpose of the holding in *Wozniak I* was to correct a misapplication of the age sixty-five reduction to a class of workers who were injured before 1968. The Legislature did not intend to reduce benefits for this class of injured workers below the minimum level of subsection 351(2). The fund's reliance on *Lopez* was misplaced and, because the age sixty-five reduction has been extensively litigated in the Bureau of Worker's Disability Compensation since *Lopez*, the fund should have been well aware that *Lopez* did not definitively decide the question. Applying *Wozniak I* retroactively would further the administration of justice. The burden of compensating for an erroneous legal decision should not be placed on an elderly group of disabled workers, and they should be paid the full amount of the benefits to which they are entitled.

5. The fact that the plaintiff failed to timely object to the application of the *Lopez* reduction does not disqualify him from receiving the retroactive application of *Wozniak I*. Where a decision is given full retroactivity, its application is not limited to those who raised the issue in a timely manner.

6. The plaintiff's attempt to recover payments improperly withheld does not constitute an application for further compensation to which the one-year-back rule, MCL 418.833(1); MSA 17.237(833)(1), applies. The two-year-back rule, MCL 418.381(2); MSA 17.237(381)(2), is inapplicable where, as here, the plaintiff has been receiving total and permanent disability benefits for an injury received before July 1, 1968. *Wozniak I* should be given full retroactive effect in favor of those who did not initially object to the

reduction of benefits pursuant to *Lopez* where the one-year-back rule and the two-year-back rule are inapplicable.

Affirmed.

WHITBECK, P.J., concurring in the result reached by the majority, wrote separately to state that the decision to give *Wozniak I* full retroactive effect should be based not on a consideration of the economic fairness of the result as it relates to Lincoln and others similarly situated but on the fact that *Wozniak I* did not establish a new principle of law.

1. WORKER'S COMPENSATION — REDUCTION OF BENEFITS AT AGE SIXTY-FIVE — MINIMUM BENEFITS.

The age sixty-five reduction in worker's compensation benefits set forth in MCL 418.357(1); MSA 17.237(357)(1) cannot reduce a totally and permanently disabled worker's benefits below the minimum established in MCL 418.351(2); MSA 17.237(351)(2) where the worker was injured before July 1, 1968.

2. WORKER'S COMPENSATION — NEW RULES OF LAW — RETROACTIVE EFFECT — PROSPECTIVE EFFECT.

Judicial decisions generally are given complete retroactive effect and legislative changes are usually prospective; the Supreme Court has made exceptions to the general rule when it has issued worker's compensation decisions that have had an effect similar to the announcement of a new rule of law; in resolving the retroactive-prospective dilemma, a court must weigh the purpose to be served by the new rule, the extent of reliance on the old rule, and the effect of retroactivity on the administration of justice.

3. WORKER'S COMPENSATION — REDUCTION OF BENEFITS AT AGE SIXTY-FIVE.

Full retroactive application of the holding in *Wozniak v General Motors Corp*, 198 Mich App 172 (1993), which corrected a misapplication of the age sixty-five reduction in worker's compensation benefits to a class of workers who were injured before 1968, is not limited to those who timely raised the issue of the misapplication (MCL 418.357[1]; MSA 17.237[357][1]).

4. WORKER'S COMPENSATION — ONE-YEAR-BACK RULE — TWO-YEAR-BACK RULE — WORDS AND PHRASES — FURTHER COMPENSATION.

An injured worker's attempt to recover worker's compensation benefits improperly withheld does not constitute an application for further compensation for purposes of the one-year-back rule; the two-year-back rule does not apply where the plaintiff has been receiving total and permanent disability benefits for an injury suffered before July 1, 1968 (MCL 418.381[2], 418.833[1]; MSA 17.237[381][2], 17.237[833][1]).

*Randall K. Caryl (Kelman, Loria, Simpson, Will, Harvey & Thompson,* by *Ann Curry Thompson,* of Counsel), for the plaintiff.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Morrison Zack,* Assistant Attorney General, for the Second Injury Fund.

Before: WHITBECK, P.J., and MACKENZIE and MURPHY, JJ.

MURPHY, J. On remand from the Supreme Court for consideration as on leave granted, 455 Mich 852 (1997), defendant Second Injury Fund appeals a decision of the Worker's Compensation Appellate Commission affirming a magistrate's modification of plaintiff's benefit award. We affirm.

Plaintiff sustained a work-related injury in 1966 while employed by defendant General Motors Corporation and was awarded total and permanent disability benefits on the basis of the loss of the industrial use of both legs. Plaintiff remained disabled after the expiration of the eight hundred-week statutory period of presumed disability and continued to receive benefits from both defendants. Plaintiff reached the age of sixty-five in 1981, and in 1985 the Second Injury Fund reduced plaintiff's differential weekly benefits to twenty-five percent of the state's average weekly wage pursuant to *Lopez v Flower Basket Nursery,* 122 Mich App 680; 332 NW2d 630 (1982). The fund further reduced plaintiff's benefits to recoup the overpayment of benefits in the previous twelve months. Plaintiff did not timely challenge these reductions.

Plaintiff filed an application seeking reinstatement of the reduced benefits pursuant to *Wozniak v Gen-*

*eral Motors Corp*, 198 Mich App 172; 497 NW2d 562
(1993) (*Wozniak I*). The magistrate concluded that
defendants were entitled to continue to take the age
sixty-five reduction pursuant to *Rotondi v Chrysler
Corp*, 200 Mich App 368; 504 NW2d 901 (1993), but
did not reach the other issues. On appeal, the
Worker's Compensation Appellate Commission
affirmed the magistrate's reliance on *Rotondi* and
noted that plaintiff's benefits could not be reduced
below the minimum level established by MCL
418.351(2); MSA 17.237(351)(2). Pursuant to *Woz-
niak v General Motors Corp (After Remand)*, 212
Mich App 40; 536 NW2d 841 (1995) (*Wozniak II*), the
commission observed that the one-year-back rule,
MCL 418.833(1); MSA 17.237(833)(1), does not apply
to limit recovery of any underpayments in violation of
subsection 351(2).

This Court denied the fund's application for leave
to appeal in an unpublished order entered September
11, 1996 (Docket No. 194191). The Supreme Court, in
lieu of granting leave to appeal, remanded the matter
to the Court of Appeals for consideration as on leave
granted, directing this Court to address whether *Woz-
niak I* should be applied retroactively to plaintiffs
who failed to timely object when their benefits were
reduced pursuant to *Lopez*.

In *Lopez*, a panel of this Court sanctioned the appli-
cation of the age sixty-five reduction in benefits set
forth in MCL 418.357(1); MSA 17.237(357)(1) to
employees who reached the age of sixty-five after
July 1, 1968. In *Wozniak I* this Court conducted a
detailed analysis of the revisions in the statutes gov-
erning the age sixty-five reduction and the case law
interpreting those statutes and concluded that *Lopez*

was wrongly decided. The *Wozniak I* Court concluded that the minimum-benefit provision of MCL 418.351(2); MSA 17.237(351)(2) was not affected by the age sixty-five reduction. For totally and permanently disabled workers whose date of injury precedes July 1, 1968, the age sixty-five reduction in subsection 357(1) cannot reduce the worker's benefit below the minimum established by subsection 351(2). *Wozniak I, supra* at *182*.

As a general rule, judicial decisions are given complete retroactive effect, while legislative changes are usually prospective. *Riley v Northland Geriatric Center (After Remand)*, 431 Mich 632, 647; 433 NW2d 787 (1988). In the context of worker's compensation law, the Supreme Court has made exceptions to the general rule when it has issued decisions that have had an effect similar to the announcement of a new rule of law. In *Gusler v Fairview Tubular Products*, 412 Mich 270; 315 NW2d 388 (1981), the Court corrected a misinterpretation of the act with regard to the adjustment of minimum benefits under MCL 418.351; MSA 17.237(351). The Court gave its holding prospective application, stating:

> Although our holding is based on what we perceive to have been the intent of the Legislature at the time of enactment of the provisions discussed, in practical effect, given the contrary interpretations of the law by the Director of the Bureau of Workers' Compensation and the bureau's subdivisions, the Workers' Compensation Appeal Board and its hearing referees, and the Court of Appeals, today's holding is not unlike the announcement of a new rule of law. Its application therefore should be treated accordingly. See *Whetro v Awkerman*, 383 Mich 235; 174 NW2d 783 (1970); *Parker v Port Huron Hospital*, 361 Mich 1; 105 NW2d 1

(1960);   *Bricker v Green*, 313 Mich 218; 21 NW2d 105 (1946). [*Gusler, supra* at 298.]

The Court revisited the prospective application of *Gusler* in *Riley, supra.* The Court noted that certain rules or principles have evolved that provide guidance in resolving the retroactive-prospective dilemma. A court must weigh (1) the purpose to be served by the new rule, (2) the extent of reliance on the old rule, and (3) the effect of retroactivity on the administration of justice. *Riley, supra* at 645-646.

As applied to this case, these principles mandate the retroactive application of *Wozniak I.* The purpose of the *Wozniak I* holding was to correct a misapplication of the age sixty-five reduction to a class of workers who were injured before 1968. The Legislative intent was never to reduce benefits for this class of injured workers below the minimum level of subsection 351(2). While the Second Injury Fund may have relied on this Court's ruling in *Lopez*, its reliance was misplaced. The application of the age sixty-five reduction has been extensively litigated in the bureau since *Lopez*, and the fund should have been well aware that *Lopez* did not definitively decide the question. *Wozniak I, supra.* Applying *Wozniak I* retroactively would further the administration of justice. While the Second Injury Fund may incur additional liabilities, the injured workers should be paid the full amount of the benefits to which they are entitled. The burden of compensating for an erroneous legal decision should not be placed on an elderly group of disabled workers. The fact that plaintiff failed to timely object to the application of the *Lopez* reduction does not disqualify plaintiff from receiving the retroactive application of *Wozniak I.* Where a decision is given full ret-

roactivity, its application is not limited to those who raised the issue in a timely manner. *Riley, supra* at 649, n 11.

Defendant fund argues that any retroactivity should be limited by the one-year-back rule, MCL 418.833(1); MSA 17.237(833)(1). However, this question has been conclusively decided in the successor case of *Wozniak II, supra*. A plaintiff's attempt to recover payments improperly withheld does not constitute an application for further compensation as defined by the statute. The two-year-back rule, MCL 418.381(2); MSA 17.237(381)(2), is inapplicable where the plaintiff has been receiving total and permanent disability benefits for an injury received before July 1, 1968. *Brecht v Save-Way Food Center*, 407 Mich 743; 288 NW2d 576 (1980). The one-year-back and two-year-back rules provide the limiting structure for back benefits in the Worker's Disability Compensation Act contemplated by the Legislature. Where these rules are inapplicable, *Wozniak I* should be given full retroactive effect in favor of those who did not initially object to the reduction of benefits pursuant to *Lopez*.

Affirmed.

MACKENZIE, J., concurred.

WHITBECK, P.J. (*concurring*). I concur with the result of the majority opinion, but through a different analysis. First, I believe we must place this matter within the context of the overall legislative scheme of the Worker's Disability Compensation Act (WDCA), MCL 418.101 *et seq.*; MSA 17.237(101) *et seq.*, for worker's compensation in this state. Although this scheme is agonizingly complex—indeed, one might claim that it is incomprehensible to the ordinary

claimant, the ordinary attorney, or the ordinary appel-
late judge—I believe we should attempt to provide
some clarity regarding the context of the important,
and endlessly controversial, principles involved. Fur-
ther, it is only through such an analysis that one can
fully appreciate the lack of merit of the position taken
by defendant-appellant Second Injury Fund in this
matter. Consequently, and although setting the con-
text is a lengthy and tedious process and although I
may be entering ground onto which even the purest
of seraphim fear to tread, I have attempted below to
provide such a context.

Second, the majority's opinion responds to only one
aspect of the Supreme Court's remand to us in this
matter. The Supreme Court directed us to consider
"whether *Wozniak v General Motors Corp*, 198 Mich
App 172 [497 NW2d 562 (1993) (*Wozniak I*)], is retro-
active in favor of those *who did not object* to the
reduction in benefits made pursuant to *Lopez v
Flower Basket Nursery*, 122 Mich App 680 [332 NW2d
630] (1982)." 455 Mich 852 (1997) (emphasis sup-
plied). While the majority clearly determines that
*Wozniak I* should be applied retroactively, it does not
directly address the issue of the alleged failure by
plaintiff-appellee Arthur Lincoln to object to the
reduction in his benefits made by the fund. I do so,
although very briefly.

Third, and perhaps most importantly, I disagree
with the basis that the majority uses to apply *Woz-
niak I* retroactively. Although the majority correctly
articulates the three-part test by which we are to
resolve a retroactive-prospective dilemma, it con-
cludes its discussion by stating that "[t]he burden of
compensating for an erroneous legal decision should

not be placed on an elderly group of disabled workers." *Ante* at 268. In the world outside the judicial context, this would, in my personal view, be exactly correct: there is no reason why Lincoln, a man born in 1916 and whom all parties agree is permanently and totally disabled through the loss of the industrial use of both legs because of a horrific accident that occurred in 1966 at a General Motors plant, should bear the economic consequences of the fund's unilateral reduction of his benefits. Such a result is, in the world of the proper economic allocation of burdens, simply not fair.

Yet, our duty under the law as I see it in this case does not involve simply a consideration of the economic fairness of the result as it relates to Lincoln and others similarly situated. Rather, we must ask the threshold question: Did the decision in *Wozniak I* establish a new principle of law? Because my answer to this question is no, I reach the same result the majority reaches in this case but by quite a different route. I therefore concur in the majority's holding that *Wozniak I* should be given full retroactive effect.

I. THE WORKER'S COMPENSATION SCHEME IN MICHIGAN

A. THE ORIGINAL ACT

In 1912, Michigan adopted its first worker's compensation act.[1] As outlined by Welch, Worker's Compensation in Michigan: Law & Practice (3d ed & 1998 Supp):[2]

---

[1] 1912 (1st Ex Sess) PA 10.

[2] I rely extensively in this section on this treatise, cited hereafter in direct quotations simply as "Welch."

The new remedy was essentially a no-fault system, under which a worker no longer had to prove negligence on the part of the employer and the employer's three defenses were eliminated. The law's intent was to require an employer to compensate a worker for any injury suffered in the course of the worker's employment, regardless of who was at fault.

In return for this almost automatic liability, the [original] Act limited the amount that a worker could recover. Workers are now entitled only to (1) certain wage loss benefits . . . , (2) the cost of medical treatment . . . , and (3) certain rehabilitation services . . . . [Welch, § 1.2, p 1-3.][3]

Importantly, because worker's compensation is a substitute for a worker's right to sue that worker's employer, it is ordinarily the *exclusive* remedy for an employee against an employer for an injury incurred in the course of covered employment.[4] As noted by Welch:

The worker may not make any other claim against the employer, even if the injury was the employer's fault. Regardless of who was at fault, and even if the employer was clearly to blame, such a worker is entitled to [worker's] compensation benefits and nothing more. [Welch, § 1.13, p 1-9.]

---

[3] See also *Crilly v Ballou*, 353 Mich 303, 308-309 (SMITH, J., joined by BLACK, VOELKER, and KAVANAGH, JJ.), 338 (EDWARDS, J., concurring in this part of Justice SMITH's opinion); 91 NW2d 493 (1958) (With the enactment of the original act, the worker gave up his common-law action and could no longer seek damages from a jury; in return for the worker's limited monetary recovery, it was intended that he should get the certainty of adequate compensatory payments without recourse to litigation.).

[4] I recognize that the "dual persona" or "dual capacity" doctrine, see *Atkinson v Detroit*, 222 Mich App 7, 12-13; 564 NW2d 473 (1997), and the intentional tort exception, MCL 418.131(1); MSA 17.237(131)(1), are narrow exceptions to this broad principle.

## B. WAGE-LOSS BENEFITS

### (1) THE PERCENTAGE CALCULATION

The Legislature has substantially, and often, amended the original act[5] over the years and I will discuss certain of those amendments, as they relate to total and permanent disability, below. Briefly summarized, however, the act currently provides for two basic types of weekly benefits. The first, *wage-loss benefits*, are paid weekly if a worker suffers a period of disability as the result of compensable injury. Most weekly wage-loss benefits are calculated as a percentage of the worker's earnings, although there are certain maxima and minima that establish a floor or ceiling on the use of these percentages.

Ascertaining the proper percentage is therefore the first step in the calculation of weekly wage-loss benefits. For injuries occurring on or after January 1, 1982, and where the incapacity for work is total, the percentage is generally eighty percent of the worker's after-tax average weekly wage. See subsection 351(1) of the WDCA, MCL 418.351(1);   MSA 17.237(351)(1). For injuries that occurred before January 1, 1982, and where the incapacity for work is total, the basic percentage is two-thirds of "average weekly wages."[6] See

---

[5] In fact, the current act is an amended version of a new Workmen's Compensation Act, 1969 PA 317, adopted in 1969.

[6] Where the worker is employed, and the disability is therefore partial and not total, that worker is entitled to eighty percent of the difference between the worker's after-tax weekly wage before the date of injury and the after-tax weekly wage that the injured worker is able to earn after the date of injury, but not more than the maximum weekly rate of compensation. See subsection 301(5)(b) of the WDCA, MCL 418.301(5)(b);   MSA 17.237(301)(5)(b). However, if the injured but employed worker's average weekly wage is equal to or more than the average weekly wage that the worker received before the date of the injury, the worker is not entitled to any wage-loss benefits for the duration of such employment. See subsec-

*Garvie v Owens-Illinois, Inc*, 167 Mich App 133, 138-
140; 421 NW2d 602 (1988) (holding that the amend-
ments that changed the computation of the compen-
sation rate from two-thirds of gross wages to eighty
percent of the worker's after-tax average weekly wage
apply only to injuries after the January 1, 1982, effec-
tive date of those amendments).

### (2) MAXIMUM LIMITS

For injuries occurring on or after January 1, 1982,
the maximum weekly rate of compensation for inju-
ries occurring within a given year is ninety percent of
the state average weekly wage as of the prior June 30
(adjusted upward to the next multiple of $1). See sub-
section 355(2) of the WDCA, MCL 418.355(2);   MSA
17.237(355)(2);   *Alexander v Director, Bureau of
Workmen's Compensation*, 53 Mich App 262; 218
NW2d 794 (1974). For injuries that occurred before
January 1, 1982, Welch observes:

> Before 1965 these [rates of compensation] were estab-
> lished directly by the legislature and amended as deemed
> appropriate. In 1965 the legislature established specific
> maximum rates for the years 1965 through 1967 and pro-
> vided that, thereafter, increases in maximum rates would be
> based on increases in the state average weekly wage in
> employment covered by the Act. This continued to be the
> law until January 1, 1982. [Welch, § 15.8, p 15-7.]

### (3) MINIMUM LIMITS

For injuries occurring on or after January 1, 1982,
there is no minimum weekly benefit for total disabil-
ity. See subsection 356(4) of the WDCA, MCL

---

tion 301(5)(c) of the WDCA, MCL 418.301(5)(c); MSA 17.237(301)(5)(c). See
also subsection 361(1) of the WDCA, MCL 418.361(1); MSA 17.237(361)(1).

418.356(4);    MSA    17.237(356)(4).    No minimum
weekly benefit for partial disability was ever included
within the law. For injuries that occurred before January 1, 1982, Welch observes:

> Before January 1, 1982, the Act provided minimum benefits in all cases except for partial disability. . . . As with maximums, the legislature revised the minimum benefits statutorily from time to time until 1965. The Act was amended in 1965 . . . to provide for automatic increases in the maximum benefits based on changes in the state average weekly wage. In *Jolliff v American Advertising Distributors, Inc*, 49 Mich App 1, 211 NW2d 260 (1973), the court of appeals held that the minimum rates increased together with the maximum rates. From 1974 until December 30, 1981, benefits were paid based on this assumption. During that time, it was assumed that the minimum rate for a worker with no dependents rose from $27 per week to $144 per week.
>
> In *Gusler v Fairview Tubular Products*, 412 Mich 270, 315 NW2d 388 (1981), *reh'g gtd*, 414 Mich 1102, 323 NW2d 909 (1982), the supreme court overruled *Jolliff*, holding that the minimum rates remained at those established in 1965. The court held that no worker should be required to repay benefits already received, but indicated that its holding applied to workers with old injury dates who were currently receiving benefits under the wrong assumption. As a result, many workers' benefits were reduced substantially. [Welch, § 15.9, p 15-8.]

### C. SPECIFIC LOSSES

The second type of weekly benefits payable for
compensable injuries under the WDCA are those for
certain *specific losses*. These losses are set out in
subsection 361(2) of the WDCA, MCL 418.361(2);  MSA
17.237(361)(2),  and are payable for the period indicated (e.g., for the loss of a thumb, sixty-five weeks),
regardless of whether the worker returns to work or

is found to have a general disability as a result of the loss. For injuries occurring on or after January 1, 1982, the rate of compensation is eighty percent of the after-tax average weekly wage, subject to the maximum and minimum rates of compensation under the WDCA. *Id.* For injuries that occurred before January 1, 1982, the rate of compensation is two-thirds of the employee's average weekly wage.

### D. TOTAL AND PERMANENT DISABILITY

#### (1) AN INJURY TODAY

The act also sets up a third category of losses, one that might be considered to be—but for its distinctive nature and its complexity—a variant of the specific-loss category. This category is *total and permanent disability*, defined by subsection 361(3)(g) of the WDCA, MCL 418.361(3)(g); MSA 17.237(361)(3)(g), as including the permanent and total loss of industrial use of both legs or both hands or both arms or one leg and one arm. If a worker were to be injured today so as to be totally and permanently disabled, that worker would receive as a basic weekly benefit paid by the employer eighty percent of the worker's after-tax average weekly wage, see subsection 351(1) of the WDCA, MCL 418.351(1); MSA 17.237(351)(1), but not more than the maximum weekly rate of compensation (i.e., currently not more than ninety percent of the state average weekly wage as of the prior June 30, as provided in subsection 355(2) of the WDCA, MCL 418.355(2); MSA 17.237(355)(2). Compensation is to be paid for the duration of the disability, and for the first eight hundred weeks the presumption of disability is conclusive. Subsection 351(1) of the WDCA, MCL 418.351(1); MSA 17.237(351)(1). After eight hundred

weeks, however, the question of disability is determined in accordance with the facts as they exist at that time. *Id.; Kidd v General Motors Corp*, 414 Mich 578, 589; 327 NW2d 265 (1982).[7]

However, a worker totally and permanently injured today is not limited to (nor, since 1955, were similarly injured workers limited to) the basic employer-paid weekly benefits under subsection 351(1) of the WDCA, MCL 418.351(1); MSA 17.237(351)(1) (or its predecessors). Rather, the worker is also entitled to *differential* benefits to be paid by the fund. The formula for calculating these differential benefits is currently set out in one extraordinarily long and extraordinarily opaque sentence in subsection 521(2) of the WDCA, MCL 418.521(2); MSA 17.237(521)(2). However, Welch describes the situation succinctly:

> The differential benefits allow the worker to take advantage of subsequent annual raises in the minimum and maximum benefits. However, the weekly benefit rate [i.e. the employer-paid rate under MCL 418.351(1); MSA 17.237(351)(1)] may not exceed the prescribed percentage of the worker's average weekly wage at the time of injury.
>
> In other words, the employer always pays a fixed rate established as of the date of injury. In subsequent years, the employee receives a benefit based on the minimum and maximum available for the current year but never greater than the prescribed percentage of the average weekly wage. The difference between increased benefits and the employer's original liability—the differential benefit—is paid by the Second Injury Fund. [Welch, § 13.9, pp 13-8 to 13-9.]

---

[7] Subject, however, to a setoff (credit) against actual earnings. *Kidd, supra* at 595-601.

Simply put, the employer pays the weekly benefit as it was in effect on the date of the injury. The fund pays the difference between that weekly benefit and the percentage of increased maximum benefit levels proportionate to the percentage of the initial weekly benefit to the maximum benefit level at the time of the injury, subject to the limit of eighty percent of the employee's average after-tax wage. See Welch, *id.*[8]

## (2) THE EVA KING PEOPLE

In this case, however, we are not dealing with a worker who suffers an injury today. Rather, we are dealing with a worker born in 1916 and injured in 1966, when he was approximately fifty years old. Lincoln is, therefore, one of the "Eva King people." This sobriquet derives from the Michigan Supreme Court's decision in *King v Second Injury Fund*, 382 Mich 480; 170 NW2d 1 (1969), in which the Michigan Supreme Court determined that a worker injured before July 1, 1968, was entitled to receive full differential payments.

The background of the *King* case is instructive. Eva King was employed at Ford Motor Company on January 16, 1948, when, in the course of her employment, "her left arm was amputated while she was

---

[8] See also *Jenkins v Great Lakes Steel Corp*, 200 Mich App 202, 207-208; 503 NW2d 668 (1993):

> On the basis of § 521(2), the method for calculating the differential benefits owed by the Second Injury Fund is to subtract the basic benefit paid by the employer from the current amount provided by statute for permanent and total disability. The difference in those two figures is the amount owed by the Second Injury Fund. The fund has no liability unless there is an increase in benefits in accordance with subsequent statutory amendments. [Citation omitted.]

operating a straddle milling machine." *King, supra* at 482. Eva King was initially awarded benefits by the Workmen's Compensation Commission on May 13, 1949. *Id.*

In 1955, the then Workmen's Compensation Act was amended by 1955 PA 250 to provide for differential payments by the fund. The 1955 amendment of subsection 9(a) of part 2 of the act, MCL 17.159(a); MSA 412.9(a), established differential payments as the difference between what the injured worker was "now receiving per week and the amount per week now provided for permanent and total disability" under various subsections (called paragraphs) of amended § 9 of the act. The 1955 amendment of subsection 9(a) also provided that, "Payments from this second injury fund shall continue after the period for which any such person is otherwise entitled to compensation under this act for the duration of such permanent and total disability according to the full rate provided in the schedule of benefits." Thereafter, Eva King sought benefits against Ford Motor Company and the fund for total and permanent disability and on February 19, 1964, a hearing referee made a finding of total and permanent disability and awarded her such benefits. *King, supra* at 482.

In 1966, subsection 9(a) of part 2 of the act was again amended, 1965 PA 44. The effect of this amendment with regard to permanently and totally disabled workers is shown below; deletions are shown by strikeovers and additions by all capitals:

> Any PERMANENTLY AND TOTALLY DISABLED person AS DEFINED IN THIS ACT who, is permanently and totally disabled and who ON OR AFTER JUNE 25, 1955, IS ENTITLED TO receiving RECEIVE payments of workmen's compensation which are

~~payable to such person~~ under this act in amounts per week
of less than is presently provided in the workmen's compen-
sation schedule of benefits for permanent and total disabil-
ity and for a lesser number of weeks than the duration of
such permanent and total disability shall ~~hereafter~~ AFTER
THE EFFECTIVE DATE OF ANY AMENDATORY ACT, BY WHICH HIS DISA-
BILITY IS DEFINED AS PERMANENT AND TOTAL DISABILITY OR BY
WHICH THE WEEKLY BENEFIT FOR PERMANENT AND TOTAL DISABILITY
IS INCREASED, receive weekly, without application, from the
second injury fund, an amount equal to the difference
between what he is now ~~receiving per week and the
amount per week~~ OR SHALL HEREAFTER BE ENTITLED TO RECEIVE
FROM HIS EMPLOYER UNDER THE PROVISIONS OF THIS ACT AS THE
SAME WAS IN EFFECT AT THE TIME OF HIS INJURY AND THE AMOUNT
NOW PROVIDED FOR HIS PERMANENT AND TOTAL DISABILITY BY THIS
OR ANY OTHER AMENDATORY ACT with appropriate application
of the provisions of paragraphs (b), (c), (d) and (e) of this
section since the date of injury. Payments from this second
injury fund shall continue after the period for which any
such person is otherwise entitled to compensation under
this act for the duration of such permanent and total disa-
bility according to the full rate provided in the schedule of
benefits.

Importantly, of course, the 1965 amendment did not
change the reference to the "amount . . . now pro-
vided" or to the "full rate provided in the schedule of
benefits."

After the 1965 amendment became effective, the
fund denied Eva King's request that she be allowed
the current benefit rate for a totally and permanently
disabled worker and limited her payments to two-
thirds of her average weekly rate at the time of her
injury, *King, supra* at 483, thereby applying the then-
existing two-thirds of average weekly wage limitation

on employer-paid weekly benefits[9] to differential ben-
efits paid by the fund. Eva King filed still another
application, which a hearing referee denied, in the
process once more limiting her to two-thirds of her
average weekly wage at the time of her injury. *Id.* Eva
King appealed and the Workmen's Compensation
Appeal Board, by a 4 to 3 vote, upheld the decision of
the hearing referee. *Id.* The Michigan Supreme Court
granted bypass of the Court of Appeals and consid-
ered the question whether Eva King's payments
should be limited to two-thirds of the average weekly
wage at the time of her injury, as the fund contended,
or whether, as she contended, she was entitled to
receive from the fund the maximum amount provided
for in the act, after the 1965 amendments became
effective, for a worker with no dependents.

The *King* Court adopted Eva King's contention that
the limitation of weekly benefits to two-thirds of the
worker's average weekly wage at the time of the
injury applied only to the employer and not to the
fund.[10] *King, supra* at 494. In essence, this ruling

---

[9] The limitation on employer's liability to two-thirds of the average
weekly wage was contained in 1927 PA 63. *King, supra* at 493.

[10] The Court quoted Eva King's argument with regard to this point
verbatim:

"The hearing referee and the majority of the appeal board
ignored the legislative intent to establish the second injury fund as
a protection to the totally and permanently disabled employee
against the rising wage scales and rising cost of living. The deci-
sions below ignore the legislative intention to employ the second
injury fund to spread the risk of such inflation in wage and price
scales to all employers (and ultimately to all consumers) through
contributions to the second injury fund. . . .

"The Michigan legislature fully intended that the very few people
who meet the restrictive definitions of 'total and permanent disabil-
ity' needed to be placed in a very special class and provided with
special attention. It is recognized that these people will be disabled

meant that the differential payments to Eva King, and others similarly situated, would rise[11] over time, in accordance with changes in the schedule of benefits or in the maxima. In making this decision, the Court endorsed the cost of living argument made by Eva King and echoed by Workmen's Compensation Appeal Board Chairman Iverson in his dissent.[12] As summarized by Welch:

---

for the remainder of their lives and that the wage structure and the cost of living, with the years passing, is rising. It is recognized that these people will need special attention because they cannot earn a living and must hire others to perform household tasks such as cutting their grass, shoveling their snow, and other tasks which a person not so seriously crippled would be able to perform without hired help. To limit such a person to two-thirds of his wage for the rest of his life would mean that he would be getting an extremely small and inadequate amount when, 20 years later, the wage structure and cost of living has risen to an alarming degree and the purchasing power of the dollar has dropped by over one half." [King, supra at 489-490.]

[11] Or, conceivably, but not practically, fall.

[12] The Court quoted Chairman Iverson's dissenting argument regarding this point verbatim:

"I believe it must be admitted that to retain the two-thirds limitation in such cases would defeat the theory underlying the creation of the second injury fund and its responsibilities. In dealing with cases beyond 800 weeks, we are confronted with weekly wages scaled to an economy 15 years past. To apply the two-thirds limit, therefore, does injustice to those whose earning power was cruelly halted at that time, stopping them cold while co-workers continued to gain in earning and purchasing power which enables them to live in the increasingly expensive and inflationary economy of today. Applying the two-thirds limit of a 15-year-old weekly wage does not even slightly accomplish for these unfortunate cast-asides what the purpose of the second injury fund presumed to do. Thus when effectuating that purpose, I feel we must read the legislature's intention in requiring the second injury fund to pay for permanent and total disability 'according to the full rate provided in the schedule of benefits' to be as defined by [another dissenting member of the appeal board]. To do otherwise keeps those persons on a woefully outdated standard and does not give them what section 9, para (a) purports to give them, 'the amount now provided

Based on the language of the statute that was in effect between June 25, 1955 and July 1, 1968, the supreme court held in [*King*], that in cases of total and permanent disability with injury dates within that period, workers were entitled to maximum benefits regardless of their average weekly wages. In other words, these workers would receive benefits from their employers equal to either two-thirds of their average weekly wage or the maximum rate in effect on their date of injury, whichever was less. They would also receive differential benefits from the Second Injury Fund to bring them up to the maximum statutory benefit for the current year. This would continue through subsequent years, even though it might have eventually resulted in compensation benefits not only higher than two-thirds of the average weekly wage but also greater than the original wage itself. [Welch, § 13.8, pp 13-7 to 13-8.]

### (3) IMPORTANT AMENDMENTS

#### (a) THE SUBSECTION 357(1) AGE SIXTY-FIVE REDUCTION

As I have noted, effective September 1, 1965, the Legislature enacted 1965 PA 44. This act contained a provision reducing benefits for an injured worker after that worker reached the age of sixty-five. (The new provision, MCL 412.9[g]; MSA 17.159[g], is now contained in subsection 357[1] of the WDCA, MCL 418.357[1]; MSA 17.237[357][1]. For ease of reference, I use the phrase "subsection 357[1] age sixty-five reduction provisions" below to describe these provisions.) The new provision provided:

> When an employee *who is receiving weekly payments or is entitled to weekly payments reaches the age of 65,* the weekly payments for each year following his sixty-fifth birthday shall be reduced by 5% of the weekly payment paid

---

for his permanent and total disability' by awarding 'the full rate provided in the schedule of benefits.' " [*King, supra* at 486-487.]

or payable at age 65, but not to less than 50% of the weekly benefit paid or payable at age 65; so that on his seventy-fifth birthday the weekly payments shall have been reduced by 50%; after which there shall be no further reduction for the duration of the employee's life. In no case shall weekly payments be reduced below the minimum weekly benefit as provided in this act. [Emphasis supplied.]

Effective July 1, 1968, the Legislature amended the subsection 357(1) age sixty-five reduction provisions through the enactment of 1968 PA 227. The amendments of the above-emphasized portion of MCL 412.9(g); MSA 17.159(g) were as follows:

When an employee who is receiving weekly payments or is entitled to weekly payments reaches OR HAS REACHED OR PASSED the age of 65 . . . .[13]

Importantly, this language deals only with a worker who was injured after that worker's sixty-fifth birthday. The fund states that, following this amendment, it applied the subsection 357(1) age sixty-five reduction provisions only in those cases where the person had been injured on or after July 1, 1968. The fund also states that "[t]his approach was consistent with well-settled decisional law of long-standing which had held various sections of . . . [the WDCA] to be prospectively applicable only."[14]

This Court construed the subsection 357(1) age sixty-five reduction provisions in *Welch v Westran*

---

[13] The Michigan Supreme Court upheld this version, against an equal protection challenge, in *Cruz v Chevrolet Grey Iron Division of General Motors Corp*, 398 Mich 117; 247 NW2d 764 (1976).

[14] The fund cites *Nicholson v Lansing Bd of Ed*, 423 Mich 89, 93; 377 NW2d 292 (1985), *Tarnow v Railway Express Agency*, 331 Mich 558, 563; 50 NW2d 318 (1951), and *LaForest v Vincent Steel Processing, Division of Letts Industries*, 59 Mich App 386, 399; 229 NW2d 466 (1975).

*Corp*, 45 Mich App 1, 4; 205 NW2d 828 (1973), aff'd by equally divided court on other grounds 395 Mich 169; 235 NW2d 545 (1975). The *Welch* panel was primarily concerned with the period between September 1, 1965, the effective date of 1965 PA 44, and July 1, 1968, the effective date of 1968 PA 227. Although not explicitly, the *Welch* panel dealt with two different sets of circumstances, two "prongs" as I will refer to them below. The first prong was the circumstance of an injured worker who was sixty-five years old before September 1, 1965, the effective date of 1965 PA 44. Citing *Pierce v Johnson*, 39 Mich App 67; 197 NW2d 109 (1972), [15] the *Welch* panel held that the age-reduction provisions of 1965 PA 44 did not apply to an injured worker who was sixty-five before September 1, 1965.[16] Although not explained further, presumably the reasoning was fairly straightforward: an injured worker who had reached the age of sixty-five before September 1, 1965, could thereafter not be a person who "reaches the age of 65." Although the *Welch* panel did not emphasize this point, under this prong of the decision, Welch—who was born on January 22, 1901, and was therefore aged sixty-four at the time of the effective date of 1965 PA 44 of September 1, 1965—*was* subject to the age reduction provisions of 1965 PA 44.

---

[15] The plaintiff in *Pierce* was seventy-nine in 1965 when 1965 PA 44 became effective. The Workmen's Compensation Appeal Board held that the subsection 357(1) age sixty-five reduction provisions of 1965 PA 44 did not apply to persons over the age of sixty-five at the time of the passage of 1965 PA 44. The *Pierce* panel said simply, "We agree." *Pierce, supra* at 68.

[16] The *Welch* panel stated, "There is no question that prior to the 1968 amendment § 412.9(g), *supra*, did not apply to persons who were 65 years old prior to the enactment of that section in 1965." *Welch, supra* at 4.

The second prong was the circumstance where a worker was injured after that worker's sixty-fifth birthday. The *Welch* panel held that the age reduction provisions of 1965 PA 44 did not apply to such a worker.[17] Again, the *Welch* panel did not explain this further but presumably its reasoning was equally straightforward: such a worker was not "receiving" or "entitled" to receive benefits at the time that worker reached the age of sixty-five. Under this prong of the decision, Welch—who was aged sixty-five on January 22, 1966, and who was injured nine days later on January 31, 1966—was *not* subject to the age reduction provisions of 1965 PA 44.

The *Welch* panel then dealt with the effect of the 1968 PA 227 amendments, stating that the Legislature "clearly indicated that after July 1, 1968," the age reduction provisions "would apply to employees who were injured subsequent to their sixty-fifth birthday." *Welch*, at 6. The *Welch* panel declined to apply the 1968 PA 227 amendments retroactively:

> However, we are not persuaded that the Legislature intended or that the humanitarian and remedial purposes of the act would be served by retrospectively applying the 1968 amendment to reduce the weekly compensation of those employees [i.e., Welch and those similarly situated] who suffered injuries after their sixty-fifth birthday but prior to July 1, 1968. Moreover, there is no language in the 1968 amendment clear, unequivocal, or otherwise which directs retrospective application. [*Id.*]

One can therefore summarize the outcome of the second prong of *Welch* straightforwardly: (1) Welch, hav-

---

[17] The *Welch* panel stated, "It is equally clear that the 1965 language was such that § 412.9(g), *supra*, was not applicable to any person who was injured subsequent to his sixty-fifth birthday." *Welch*, *supra* at 4.

ing turned the age of sixty-five nine days before he was injured, was not subject to the age reduction provisions of 1965 PA 44,  (2) the amendments in 1968 PA 227  would, if applied retroactively, have subjected Welch to the age reduction provisions, but (3) the *Welch* panel determined that the 1968 PA 227 amendments should not be applied retroactively.[18]

There is, however, a portion of the *Welch* opinion that is not so straightforward. The *Welch* panel observed, before the decisional paragraphs:

> Since the section as amended [by 1968 PA 227] provides that when the employee is either receiving or entitled to receive payment and reaches or has reached or passed age 65 his benefits will be reduced, it is clear that the Legislature intended that *subsequent to July 1, 1968, all persons over the age of 65 are subject to the reduced-benefit provision, no matter when the injury was incurred. [Welch, supra* at 5 (emphasis supplied).]

---

[18] *Brown v Saginaw Metal Casting Plants, Chevrolet Motor Division, General Motor Corp*, 68 Mich App 85, 90; 241 NW2d 769 (1976), held the 1965 PA 44 age reduction provision to be unconstitutional on equal protection grounds:

> [U]nder the 1965-1968 version of the statute, a workman injured at the age of 64 has his benefits reduced by 50% by the age of 75, while there is no reduction whatsoever in the benefits paid to a person injured at age 65. Such a classification lacks a rational basis.
> . . . Consequently, we hold that the reduction provision in effect from 1965 to 1968 arbitrarily and unreasonably discriminates against workers solely on the basis of age, and cannot be properly applied to workers injured during that time period, including plaintiff.

The Michigan Supreme Court vacated the original decision in *Brown* and remanded for reconsideration in light of its decision in *Cruz*, n 13, *supra.* See 399 Mich 828 (1977). On remand, this Court adhered to its original decision in an unpublished opinion per curiam. The Supreme Court thereafter denied leave to appeal. 400 Mich 852 (1977).

As I outline below, this observation, that I will refer to as the *"Welch* dicta,"* would later return to haunt this Court. In light of the actual decision in *Welch,* however, it is fairly clear that what the *Welch* panel must have meant was:

> Because the section as amended provides that when the employee is either receiving or entitled to receive payment and reaches or has reached or passed the age of sixty-five his benefits will be reduced, it is clear that the Legislature intended that after July 1, 1968, all persons (EXCEPT THOSE WHO WERE INJURED AFTER THE AGE OF SIXTY-FIVE BUT BEFORE JULY 1, 1968) over the age of sixty-five are subject to the reduced-benefit provision, no matter when the injury was incurred.

Again, because Welch was injured on January 31, 1966, nine days *after* he reached the age of sixty-five but *before* July 1, 1968, the effective date of the 1968 PA 227 amendments, he was not subject to the age reduction provisions contained in those amendments.

### (b) 1969 PA 317

The entire act was comprehensively reorganized by 1969 PA 317.[19] The concept of differential payments to be made by the fund was kept intact and the amendments provided that any worker who, before July 1, 1968, had been receiving or was entitled to receive benefits from the fund "shall continue to receive or be entitled to receive such benefits" from the fund. MCL 418.521(3); MSA 17.237(521)(3). However, MCL 418.521(2); MSA 17.237(521)(2) was amended in pertinent part as follows:

---

[19] Indeed, the entire act is now correctly cited as "The Worker's Disability Compensation Act of 1969." See MCL 418.101; MSA 17.237(101).

Payments from this second injury fund SUCH PAYMENTS
shall continue after the period for which as such THE person is otherwise entitled to compensation under this act for
the duration of such THE permanent and total disability
according to the full rate provided in the schedule of
benefits.

According to Welch, § 13.8, p 13-8, the 1969 PA 317
amendments meant that after their effective date of
July 1, 1968,[20] "the increases in differential benefits
stop when compensation equals two-thirds of the
wages at the time of injury." Lincoln asserts in his
brief that "[s]ince this was a clear change in the law
with no possible retroactive effect, however, the Eva
King people remained ever after entitled to the full
difference."[21]

(c) 1980 PA 357: THE INTERPLAY BETWEEN SUBSECTION 351(2) AND
SUBSECTION 356(3)

1980 PA 357, parts of which were effective January
1, 1982, added to the WDCA new subsection 351(2),
MCL 418.351(2); MSA 17.237(351)(2), which reads as
follows:

A totally and permanently disabled employee whose date
of injury preceded July 1, 1968, is entitled to the compensation under this act that was payable to the employee immediately before the effective date of this subsection, or compensation equal to 50% of the state average weekly wage as
last determined under section 355 [MCL 418.355; MSA
17.237(355)], whichever is greater.

---

[20] Which, as noted above and perhaps not coincidentally, was also the
effective date of 1968 PA 227.

[21] Lincoln cites *King, supra,* for this proposition but, although 1969 PA
317 was passed when *King* was pending before the Michigan Supreme
Court, there is no reference in the *King* decision to it.

1980 PA 357 also added to the WDCA a new subsection 356(3), MCL 418.356(3); MSA 17.237(356)(3), which at the present time reads as follows:

> The minimum weekly benefit for 1 or more losses stated in section 361(2) [MCL 418.361(2); MSA 17.237(361)(2)] and (3) [MCL 418.361(3); MSA 17.237(361)(3)] shall be 25% of the state average weekly wage as determined under section 355 [MCL 418.355; MSA 17.237(355)].

The interplay between subsection 351(2) and subsection 356(3) of the WDCA was not to be reconciled until this Court's decision in *Wozniak I.*

#### (4) *LOPEZ*

In 1982, this Court decided *Lopez, supra.* Lopez was apparently born sometime before October 1906, because he was apparently fifty-six years old when he lost the industrial use of both hands when injured on October 27, 1962.[22] A hearing referee determined that Lopez was permanently and totally disabled, and the employer and the fund appealed to the Worker's Compensation Appeal Board. *Lopez,* at 682. The board affirmed the hearing referee's decision with certain modifications. *Id.*

On appeal, the employer and the fund asserted that the Worker's Compensation Appeal Board erred in not applying the subsection 357(1) age sixty-five reduction provisions. (The Worker's Compensation Appeal Board had refused to apply the subsection 357(1) age sixty-five reduction provisions because they were not

---

[22] Notably, this Court in *Lopez, supra* at 684-685, first indicated that the injury underlying that case occurred on October 27, 1962. However, the panel thereafter inexplicably stated, "Plaintiff was 56 years old at the time of his injury in April, 1962 . . . ." *Id.* at 687.

in effect at the time of Lopez' injury in 1962.) This Court first noted that in *Welch, supra,* the Court was faced with the question whether the subsection 357(1) age sixty-five reduction provisions, as amended by 1968 PA 227, operated " 'retroactively to reduce the weekly benefits of a plaintiff who suffered a compensable injury after his sixty-fifth birthday but prior to July 1, 1968, the effective date of the amendment.' " *Lopez, supra* at 688, quoting *Welch, supra* at 5. The *Lopez* Court summarized the *Welch* holding as being that "the statute [1968 PA 227] was not to be applied retroactively to reduce the plaintiff's benefits in that case prior to July 1, 1968." *Lopez, supra* at 688.

It is worthwhile to stop at this point to review the bidding. Under the first prong of *Welch,* the subsection 357(1) age sixty-five reduction provisions of 1965 PA 44 did not apply to an injured worker who was sixty-five years old before September 1, 1965. Lopez was apparently fifty-nine at that time; therefore, under the first prong of *Welch,* the subsection 357(1) age sixty-five reduction provisions of 1965 PA 44 would have applied to him.

Under the second prong of *Welch,* the subsection 357(1) age sixty-five reduction provisions of 1965 PA 44 did not apply to a worker injured after that worker's sixty-fifth birthday. Lopez was injured, at the earliest, on October 27, 1962, when he was apparently fifty-six, or, at the latest, sometime before September 1, 1965, when he would have been approximately fifty-nine.[23] Therefore, whether Lopez was fifty-six at

---

[23] The *Lopez* panel noted that the Worker's Compensation Appeal Board found that Lopez "was totally and permanently disabled prior to September 1, 1965," see *Lopez, supra* at 685, and then simply held that there was

the time of his injury or fifty-nine at the time of his injury, under the second prong of *Welch*, the subsection 357(1) age sixty-five reduction provisions of 1965 PA 44 also would have applied to him because he was injured *before* his sixty-fifth birthday.

The *Lopez* Court then noted that Lopez reached the age of sixty-five "after July 1, 1968." *Id.* at 689. As I have analyzed *Welch*, the fact that Lopez turned sixty-five after July 1, 1968, the effective date of 1968 PA 227, was irrelevant because the issue was not whether Lopez turned sixty-five after July 1, 1968, but rather whether Lopez was injured after he turned sixty-five. Because Lopez was injured well *before* he turned sixty-five, the subsection 357(1) age sixty-five reduction provisions of 1965 PA 44 applied to him without regard to the July 1, 1968, effective date of 1968 PA 277 and, indeed, without regard to whether 1968 PA 227 was to be applied retroactively and prospectively or prospectively only.

In my view, the *Lopez* panel was led to its erroneous reasoning by the *Welch* dicta that I described above. In any event, however, the *Welch* dicta, even if properly understood by the *Lopez* panel, would not have affected the result in *Lopez under the facts and the law as the Lopez panel considered them.* The fact of the matter remains that Lopez was fifty-nine years old on September 1, 1965, and therefore under the first prong of *Welch*, the subsection 357(1) age sixty-five reduction provisions of 1965 PA 44 applied to him. The fact of the matter further remains that Lopez was injured well before he turned sixty-five

competent evidence on the record to support the board's finding in this regard, *id.* at 686.

and therefore under the second prong of *Welch*, the subsection 357(1) age sixty-five reduction provisions of 1965 PA 44 also applied to him. Thus, *within the factors that the Lopez panel considered*, it reached the right result, albeit perhaps for the wrong reason.

It is critically important to note that the *Lopez* panel did *not* discuss the interplay between subsection 351(2) and subsection 356(3) of the WDCA at all.

### (5) *WOZNIAK I*

#### (a) THE SUBSECTION 357(1) AGE SIXTY-FIVE REDUCTION PROVISIONS RULING

In 1993, this Court decided *Wozniak I*. Wozniak was born sometime in 1916, because she turned the age of sixty-five in 1981. *Wozniak I*, at 178. She had been totally and permanently disabled by incurable insanity since 1964,[24] *id.*, at 174, when she would have been forty-seven or forty-eight. It is again worthwhile to review the bidding. Under the first prong of *Welch*, the subsection 357(1) age sixty-five reduction provisions of 1965 PA 44 did not apply to an injured worker who was sixty-five before September 1, 1965. Wozniak was forty-nine at that time; therefore, under the first prong of *Welch*, the subsection 357(1) age sixty-five reduction provisions of 1965 PA 44 would have applied to her.

Under the second prong of *Welch*, the subsection 357(1) age sixty-five reduction provisions of 1965 PA 44 did not apply to a worker injured after that worker's sixty-fifth birthday. Wozniak was "injured,"

---

[24] This was after incurable insanity or "imbecility" was statutorily included in the definition of "total and permanent disability" by 1954 PA 175, MCL 412.10; MSA 17.160. *Redfern v Sparks-Withington Co*, 403 Mich 63, 70, n 1; 268 NW2d 28 (1978).

at the latest, in 1964, when she was forty-eight. Therefore, under the second prong of *Welch,* the subsection 357(1) age sixty-five reduction provisions of 1965 PA 44 would also have applied to her because she was injured *before* her sixty-fifth birthday.

The *Wozniak I* panel was therefore faced with the same subsection 357(1) age sixty-five reduction provisions of the WDCA that were construed by the *Welch* panel and the *Lopez* panel. The *Wozniak I* panel first stated that the *Lopez* panel "misconstrued the holding in *Welch* by quoting a portion of the *Welch* opinion out of context." *Wozniak I, supra* at 176. The *Wozniak I* panel then quoted the *Welch* dicta and stated:

> The Court in *Welch* then concluded that 1968 PA 227, § 9(g) could not be applied retrospectively in that situation. This Court's decision in *Lopez* turned the *Welch* holding on its head. [*Id.* at 177.]

In my view, this statement in the *Wozniak I* decision is mistaken. *Lopez* did not turn the *Welch* holding on its head.[25] Rather, although perhaps utilizing the wrong reasoning, *Lopez* appropriately applied the *Welch* holding to the facts before it.

The *Wozniak I* panel, however, added a totally new factor to the equation, a factor that neither the *Welch* panel nor the *Lopez* panel considered at all. The *Wozniak I* panel went back to § 3 of the repealer part of 1965 PA 44. This section provided:

> All of the provisions of this 1965 amendatory act shall apply *only to personal injuries the date of injury of which*

---

[25] See *Rotondi v Chrysler Corp,* 200 Mich App 368, 378; 504 NW2d 901 (1993): "We do not necessarily agree with *Wozniak's* discussion of *Lopez* . . . because our reading of *Welch* . . . leads us to conclude that *Lopez* correctly read *Welch.*"

*occurs on or after the effective date of this act,* except as
otherwise specifically provided in this act and except for
the amendment to part 2, section 4, concerning selection of
physicians as provided in this act. [Emphasis supplied.]

The *Wozniak I* panel then pointed out that nothing in
1968 PA 227 purported to alter the retroactivity limit-
ing provisions of § 3 of the repealer part of 1965 PA
44. The panel concluded that Wozniak, whose year of
injury, 1964, was before the effective date of both
1965 PA 44 and 1968 PA 227, September 1, 1965, and
July 1, 1968, respectively, was exempt from the sub-
section 357(1) age sixty-five reduction provisions
under this section. *Wozniak I, supra* at 178. The
*Wozniak I* panel went on to note that subsection
891(1) of 1969 PA 317, MCL 418.891(1); MSA
17.237(891)(1), carried forward these retroactivity
limiting provisions:

To the extent that they are reenacted herein, all the provi-
sions of former Act No. 44 of the Public Acts of 1965 shall
apply *only to personal injuries the date of which occurs on
or after September 1, 1965,* except as otherwise provided in
such act and except for the amendment to part 2, section 4
of that act, concerning selection of physicians as provided
in that act. [Emphasis supplied.][26]

On the basis of these two provisions, the *Wozniak I*
panel implicitly overruled both prongs of *Welch* with
respect to injuries that occurred before September 1,
1965, as well as explicitly overruling *Lopez*, and deter-
mined that the subsection 357(1) age sixty-five reduc-

---

[26] See also *Rotondi*, n 25, *supra* at 378: "Nevertheless, we recognize
that *Lopez* was erroneously decided on its facts because the plaintiff in
*Lopez* was injured in 1962, a date to which the age sixty-five reduction
does not apply according to the uncompiled § 3 [of the repealer part] of
1965 PA 44."

tion provisions of 1965 PA 44 and 1968 PA 227 simply did not apply to persons who were injured before September 1, 1965. Because Wozniak was injured in 1964, these subsection 357(1) age sixty-five reduction provisions did not apply to her.[27] The *Wozniak I* rule, although arrived at in a tortuous fashion, is therefore a simple one: if a worker was injured before September 1, 1965, the subsection 357(1) age sixty-five reduction provisions in 1965 PA 44 as amended by 1968 PA 227 do not apply to that worker but if the worker was injured after September 1, 1965, these subsection 357(1) age sixty-five reduction provisions do apply.

(b) THE SUBSECTION 351(2) AND SUBSECTION 356(3) RULING

The *Wozniak I* panel then dealt with an entirely *separate* issue, that of the minimum rate to be applied to a totally and permanently disabled worker. The fund relied on subsection 356(3) that, at that time, provided:

> The minimum weekly benefit for 1 or more losses stated in section 361(2) and (3) shall be 25% of the state average weekly wage as determined under section 355.

Subsection 361(2) of the WDCA, MCL 418.361(2); MSA 17.237(361)(2), deals with specific losses and was not relevant. Subsection 361(3) of the WDCA, MCL 418.361(3); MSA 17.237(361)(3), deals with total and permanent disability. The fund contended, therefore, that under subsection 356(3) Wozniak was entitled to a minimum benefit of twenty-five percent of the state

---

[27] By analogy, the subsection 357(1) age sixty-five reduction provisions would also not apply to Lopez, who was injured before September 1, 1965, but would apply to Welch, who was injured in 1966.

average weekly wage. Because that rate in 1992 was above two-thirds of Wozniak's average weekly wage at the time of her injury in 1964, the fund argued that the twenty-five percent minimum properly constituted her actual rate of compensation, in essence contending that the twenty-five percent minimum was also Wozniak's maximum rate of compensation.

Wozniak relied on subsection 351(2) that, as noted above, provides:

> A totally and permanently disabled employee whose date of injury preceded July 1, 1968, is entitled to the compensation under this act that was payable to the employee immediately before the effective date of this subsection, or compensation equal to 50% of the state average weekly wage as last determined under section 355, whichever is greater.

Wozniak contended, therefore, that under subsection 351(2) she was entitled to the greater of fifty percent of the state average weekly wage or her benefit rate on December 31, 1969 (the effective date of 1969 PA 317, § 351). Because fifty percent of the state average weekly wage was above her benefit rate on December 31, 1969, Wozniak argued that fifty percent of the state average weekly wage was her proper minimum rate.

The *Wozniak I* panel agreed with Wozniak. Applying the rule of statutory construction favoring the specific over the general, the panel found that subsection 351(2) was clearly specific while subsection 356(3) was clearly general and concluded:

> Given that the two sections were once part of the same amendatory act, the legislative intention, which is always paramount, seems manifestly clear: § 356(3) is intended to apply to permanently and totally disabled workers injured

on or after July 1, 1968, as well as to all workers with specific loss injuries, establishing a minimum benefit rate of twenty-five percent of the state average weekly wage. Section 351(2) establishes a minimum benefit rate of fifty percent of the state average weekly wage, or the benefit rate in effect on December 31, 1969, whichever is greater, for totally and permanently disabled workers whose date of injury precedes July 1, 1968.

Accordingly, the commission erred in declaring that plaintiff's minimum benefit rate is twenty-five percent of the state average weekly wage, when it should be fifty percent. Had the Legislature intended to repeal § 351(2) by implication, it would have added the phrase "notwithstanding the date of injury," or words to that effect, at the beginning of § 356(3). [*Wozniak I, supra* at 182.]

### (6) *WOZNIAK II*

In 1995, this Court decided *Wozniak v General Motors Corp (After Remand)*, 212 Mich App 40; 536 NW2d 841 (1995) (*Wozniak II*). Following the decision in *Wozniak I*, Wozniak, not surprisingly, sought to recover the benefits that had been denied to her. The fund contended, and the Worker's Compensation Appellate Commission determined, that the "one-year-back" rule restricted Wozniak's attempt to recover these benefits to one year back from the date of her application. The "one-year-back" rule is contained in subsection 833(1), MCL 418.833(1); MSA 17.237(833)(1):

If payment of compensation is made, other than medical expenses, and an application for further compensation is later filed with the bureau, no compensation shall be ordered for any period which is more than 1 year prior to the date of filing of such application.

Citing previous decisions by the Worker's Compensation Appellate Commission and its predecessor, the *Wozniak II* panel held that the one-year-back rule does not apply to an injured worker's request for a rate change or correction and stated that the "plaintiff is not barred by the one-year-back rule from collecting amounts that this Court held had been withheld wrongfully." *Wozniak II, supra* at 44. Importantly, however, the *Wozniak II* panel stated:

> We decline defendants' invitation to decide whether this Court's previous decision in this case [i.e., in *Wozniak I*] should be applied retroactively to employees who did not object to the benefit reduction. [*Id.*]

### (7) CONCLUSION

In conclusion, I believe the state of the law as it currently stands is as follows. *First*, with respect to a worker injured after September 1, 1965, *Welch* remains good law. Therefore, under the first prong of *Welch*, the age sixty-five reduction provisions of 1965 PA 44 do not apply to an injured worker who was sixty-five before September 1, 1965 (but who was injured after that date but before July 1, 1968). Further, under the second prong of *Welch*, the age reduction provisions of 1965 PA 44 do not apply to a worker injured after that worker's sixty-fifth birthday (again if the injury occurred after September 1, 1965, but before July 1, 1968). In all other respects, the subsection 357(1) age sixty-five reduction provisions do apply to workers injured after September 1, 1965, but before July 1, 1968.

*Second*, with respect to a worker injured before September 1, 1965, the rule in *Wozniak I* governs.

Under this rule, the age reduction provisions in 1965 PA 44 as amended by 1968 PA 227 do not apply to that worker.

*Third*, with respect to rates for totally and permanently disabled workers, *Wozniak I* also governs. Thus, subsection 356(3) applies to permanently and totally disabled workers injured on or after July 1, 1968, as well as to all workers with specific loss injuries, and establishes a minimum benefit rate of twenty-five percent of the state average weekly wage. By contrast, subsection 351(2) applies to totally and permanently disabled workers whose date of injury preceded July 1, 1968, and establishes a minimum benefit rate of fifty percent of the state average weekly wage, or the benefit rate in effect on December 31, 1969, whichever is greater.

*Fourth*, as stated in *Wozniak II*, the one-year-back rule in subsection 833(1) of the WDCA, MCL 418.833(1); MSA 17.237(833)(1), does not apply to an injured worker's request for a rate change or correction.

*Fifth*, the issue whether the decision in *Wozniak I* should be applied retroactively to injured workers who did not object to benefit reductions remains open. It is this issue that we are to decide pursuant to the Supreme Court's remand to us.

### E. THE SECOND INJURY FUND

I have discussed the fund, above, exclusively within the context of total and permanent disability. As noted by Welch, making differential payments to totally and permanently disabled workers is only one of the fund's many purposes and was indeed not its original purpose. Rather, the Legislature created the fund to provide compensation for "second injuries."

This purpose was contained in old part 2, § 8a of the original act as amended (hence the sobriquet "8a" cases), now subsection 521(1) of the WDCA, MCL 418.521(1); MSA 17.237(521)(1). As Welch explains:

> This section provides that if a worker has lost a hand, arm, foot, leg, or eye, and subsequently loses another as the result of an industrial injury, the employer must pay benefits only for the specific loss. . . . After that, the Second Injury Fund assumes responsibility for total and permanent disability benefits. The purpose of this provision was to enhance the employability of workers who have previously lost a member. It does not apply if a non—employment-related loss of a member follows an employment-related loss of a member. For this provision to apply, the second loss must be employment-related. [Welch, § 14.2, p 14-2.]

The current sections of the act governing the fund are §§ 501-561 of the WDCA, MCL 418.501-418.561; MSA 17.237(501)-17.237(561). The fund is managed by three trustees who are appointed by the Governor with senatorial advice and consent, as provided in § 511 of the WDCA, MCL 418.511; MSA 17.237(511). The fund is financed by assessments on insurers and self-insured employers, as provided in § 551 of the WDCA, MCL 418.551; MSA 17.237(551). The fund contends that its trustees act in a fiduciary context. However, my view is that the fund does not operate as a fiduciary for any particular private party, but rather functions as a state entity to carry out governmental functions. As the Michigan Supreme Court has stated:

> The Second Injury Fund is a *state* insurance fund created by the Legislature to insure carriers and self-insured employers against certain losses occurring due to worker's compensation claims. *The Second Injury Fund does not belong to the carriers. No employer or carrier has a direct or vested interest in the fund.* Rather, the carriers and self-

insured employers pay annual assessments to the fund. *Once paid, these assessments become state or public moneys.* Like any insurance scheme, the Second Injury Fund spreads the risk of worker's compensation among all the self-insured employers and carriers. [*McAvoy v H B Sherman Co*, 401 Mich 419, 450; 258 NW2d 414 (1977) (citations omitted; first emphasis in original; other emphases supplied).]

## II. THE LINCOLN CASE

### A. BASIC FACTS

Arthur Lincoln was born on August 6, 1916, and was injured on June 12, 1966, when he was caught in a conveyor while at work at a General Motors plant. At the time of his injury, Lincoln was approximately fifty. Once again, therefore, it is important to review the bidding. Lincoln is a worker injured after September 1, 1965. Therefore, with regard to him, *Welch* remains good law. Under the first prong of *Welch*, the subsection 357(1) age sixty-five reduction provisions of 1965 PA 44 do not apply to an injured worker who was sixty-five before September 1, 1965, but who was injured after that date. Lincoln was approximately fifty before September 1, 1965. Therefore, under the first prong of *Welch*, the subsection 357(1) age sixty-five reduction provisions apply to him.

Under the second prong of *Welch*, the subsection 357(1) age sixty-five reduction provisions of 1965 PA 44 do not apply to a worker injured after that worker's sixty-fifth birthday, again if the injury occurred after September 1, 1965. Lincoln was injured when he was approximately fifty. Therefore, under the second prong of *Welch*, the subsection 357(1) age sixty-five reduction provisions also apply to him.

*The retroactive-prospective issue before this Court is therefore not with respect to the applicability of the subsection 357(1) age sixty-five reduction provisions.* Rather, the retroactive-prospective issue is with respect to the *other* holding in *Wozniak I:* that subsection 351(2) applies to totally and permanently disabled workers whose date of injury preceded July 1, 1968, and establishes a minimum benefit rate of fifty percent of the state average weekly wage, or the benefit rate in effect on the effective date of subsection 351(2), January 1, 1982, whichever is greater.[28]

Clearly, Lincoln's date of injury preceded July 1, 1968, and equally clearly the fund commenced on June 11, 1985, to reduce Lincoln's differential benefits to a rate below fifty percent of the state average weekly wage and continued this reduction until February 2, 1993. Under *Wozniak I,* therefore, the fund erred in reducing Lincoln's differential benefits below fifty percent of the state average weekly wage or the benefit in effect on January 1, 1982, whichever was greater.

### B. PROCEDURAL HISTORY

The fund recognized Lincoln's right to differential benefits on October 21, 1974. Following the January 1, 1982, effective date of 1980 PA 357 adding subsec-

---

[28] In his prayer for relief, Lincoln states his position unequivocally:

Because of defendant Fund's unilateral, unlawful reduction in benefits in violation of clear statutory language, Lincoln requests that this Honorable Court order the defendant-appellant to repay Lincoln all wrongfully withheld benefits from June 1984, *the time it began the reduction in Lincoln's differential compensation to a rate below fifty percent (50%) of the State Average Weekly Wage,* until it recommenced proper payment in February, 1993. [Emphasis supplied.]

tion 351(2), the fund began paying Lincoln's differential benefits at a rate that, together with the amount paid by the employer, equaled fifty percent of the state average weekly wage for 1982 and each ensuing calendar year.

On June 11, 1985, after the Michigan Supreme Court's denial of leave to appeal in *Lopez*, the fund began reducing Lincoln's differential benefits. The fund states that "[p]laintiff's weekly differential benefit rate was thus reduced *by reason of the unambiguous holding of Lopez*, to 25% of the state's average weekly wage, and thereafter maintained at that amount annually, in reliance upon MCL 418.356(3); MSA 17.237(356)(3)." (Emphasis supplied.) This statement is completely false. *There was no unambiguous holding in Lopez relating to subsection 356(3). Lopez* dealt *solely* with the subsection 357(1) age sixty-five reduction provisions.[29]

The fund also applied the one-year-back rule to recoup the alleged overpayments for the twelve months preceding June 11, 1985. Lincoln did not, in any direct proceeding before the bureau, challenge either of these reductions until he filed a petition for a hearing on July 20, 1993, in which he sought additional differential benefits through a retroactive application of *Wozniak I* from June 11, 1984, to February 2, 1993.

The parties submitted briefs to the magistrate, who mailed her decision on January 25, 1995. The magistrate correctly used this Court's decision in *Rotondi v*

---

[29] Indeed, the notice from the fund on June 11, 1985, states that [p]ayment shall be adjusted *as provided by Section 357* of the Worker's Disability Compensation Act as interpreted by the Court of Appeals in [*Lopez v Flower Basket Nursery*], 122 Mich App 680 (1982)."

*Chrysler Corp*, 200 Mich App 368; 504 NW2d 901 (1993), to analyze the issue of the applicability of the subsection 357(1) age sixty-five reduction provisions.[30] The magistrate in this case therefore held that "defendants [the fund and General Motors] are entitled to apply the age-65 reduction provision in this matter." The fund then appealed to the Worker's Compensation Appellate Commission (the WCAC). The WCAC affirmed the magistrate's reliance on *Rotondi*. In a footnote, however, the WCAC also noted correctly that *Rotondi* held that the age reduction provisions cannot operate to reduce a totally and permanently disabled worker's benefits below the minimum established in subsection 351(2): fifty percent of the state average weekly wage or the benefit in effect on the effective date of the subsection (January 1, 1982). The WCAC cited *Wozniak II* for the proposition that the one-year-back rule does not apply so as to limit recovery of any underpayments in violation of subsection 351(2) and concluded that Lincoln "is entitled to all

---

[30] *Rotondi* dealt with a worker born on July 14, 1911. *Rotondi, supra* at 370. As with Lincoln, in June 1985, the fund reduced Rotondi's benefits to account for the subsection 357(1) age sixty-five reduction provisions. *Rotondi, supra* at 371. The *Rotondi* panel, using exactly the logic set out above, found that the subsection 357(1) age sixty-five reduction provisions "unambiguously" applied to Rotondi and that "[t]he expressed legislative intent is that the age sixty-five reduction apply to cases where the injury occurred after September 1, 1965." *Rotondi, supra* at 376-377. Rotondi was injured on August 26, 1966, when he was fifty-five. *Id.* at 370. Under the first prong of *Welch*, the subsection 357(1) age sixty-five reduction provisions do not apply to an injured worker who was sixty-five before September 1, 1965, but who was injured after that date. Rotondi did not fall within that exception. Under the second prong of *Welch*, the subsection 357(1) age sixty-five reduction provisions do not apply to a worker injured after that worker's sixty-fifth birthday, again if the injury occurred after September 1, 1965. Rotondi also did not fall within that exception. Therefore, the subsection 357(1) age sixty-five reduction provisions applied to Rotondi.

rights established in *Rotondi* and the 1995 *Wozniak* decision." Presumably, this meant that that WCAC had ruled that the subsection 357(1) age sixty-five reduction provisions apply to Lincoln as do the limitations in subsection 351(2)—and therefore that the limitations in subsection 356(3) do *not* apply. This ruling was, in my view, exactly correct.

The fund sought leave to appeal to this Court, but we denied that application. However, as noted near the beginning of this concurrence, the Michigan Supreme Court remanded for "consideration of the issue whether [*Wozniak I*] is retroactive in favor of those who did not object to the reduction in benefits made pursuant to [*Lopez*]." 455 Mich 852 (1997). Again, I note that the reduction of benefits in *Lopez* related *solely* to the subsection 357(1) age sixty-five reduction provisions. Despite the imprecision in the language, therefore, I presume that the Supreme Court was actually asking us to consider whether the decision of this Court in *Wozniak I* with respect to the application of subsection 351(2) should be made retroactive in favor of Lincoln and all others who did not object to the fund's erroneous application of the wrong statutory provision, subsection 356(3).

### III. FAILURE TO OBJECT

Lincoln, of course, did not object to the fund's reduction of his differential benefits until after this Court's decision in *Wozniak I*. However, from my review of the WDCA, nothing in that statute precludes Lincoln from obtaining in a "retroactive" fashion the benefits that were incorrectly withheld from him by the fund. Lincoln's failure to object does not alter this situation. Simply put, the fund, as a creature of the

statute, was obligated at all times to pay differential benefits in accordance with that statute.

I further agree with both the majority's reasoning and its conclusion that neither the one-year-back rule, subsection 833(1), nor the two-year-back rule, MCL 418.381(2); MSA 17.237(381)(2), limits Lincoln's right to recovery. In my view, these rules are totally irrelevant to any failure by Lincoln to object to the fund's unilateral decision to reduce his differential benefits, for the reasons well stated by the majority.

### IV. THE RETROACTIVE-PROSPECTIVE DILEMMA

#### A. OVERVIEW

##### (1) THE TENSION BETWEEN DISCOVERING THE LAW AND MAKING THE LAW

As noted by former Justice MOODY[31] "[n]otions of retrospectivity and prospectivity have their roots in two diametrically opposed theories of jurisprudence." The first view, widely attributed to Blackstone, is that courts function to discover and declare the law rather than to make it. Therefore, when judges change legal rules, they

> do not pretend to make a new law, but to vindicate the old one from misrepresentation. For if it be found that the former decision is manifestly absurd or unjust, it is declared, not that such a sentence was *bad law;* but that it was *not law* . . . .[32]

---

[31] See Moody, *Retroactive application of law-changing decisions in Michigan,* 28 Wayne L R 439, 441 (1982).

[32] 1 Blackstone, Commentaries on the Laws of England (3d ed, 1884) p 69 (emphasis in the original). See also *Linkletter v Walker,* 381 US 618, 623, n 7; 85 S Ct 1731; 14 L Ed 2d 601 (1965).

Justice MOODY observed that, under this view, a law-changing decision, because it is merely a statement of what had always been the "true" law, must of necessity be retroactively applied.[33]

A second view asserts that judges not only discover law but *make* law.[34] Under this theory, decisions that change the law should not automatically apply retrospectively. The tension between these two views is evident throughout much of our jurisprudence regarding this subject. In any event, however, it is clear that, with regard to state-law issues, we are to resolve the retroactivity-prospectivity dilemma without regard to federal constitutional principles. As stated by the United States Supreme Court in *Great Northern R Co v Sunburst Oil & Refining Co*, 287 US 358, 364-365; 53 S Ct 145; 77 L Ed 360 (1932):

> We think the federal constitution has no voice upon the subject. A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions. . . . On the other hand, it may hold to the ancient dogma that the law declared by its courts had a Platonic or ideal existence before the act of declaration, in which event the discredited declaration will be viewed as if it had never been, and the reconsidered declaration as law from the beginning. . . . The alternative is the same whether the subject of the new decision is common law . . . or statute. . . . The choice for any state may be determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and

---

[33] Moody, n 31, *supra* at 441.

[34] See Carpenter, *Court decisions and the common law*, 17 Colum L R 593, 594-595 (1917).

nature. We review not the wisdom of their philosophies, but the legality of their acts.

See also *People v Hampton*, 384 Mich 669, 674; 187 NW2d 404 (1971).

### (2) CRIMINAL MATTERS V CIVIL MATTERS

With respect to criminal matters, the United States Supreme Court has generally looked at three factors to determine whether a law should be applied retroactively or prospectively. These factors are (1) the purpose of the new rule, (2) the general reliance on the old rule, and (3) the effect on the administration of justice. See *Tehan v United States ex rel Shott*, 382 US 406; 86 S Ct 459; 15 L Ed 2d 453 (1966); *Linkletter v Walker*, 381 US 618; 85 S Ct 1731; 14 L Ed 2d 601 (1965). These factors have been adopted in Michigan. See *Hampton, supra* at 674-679; see also *People v Sexton*, 458 Mich 43, 57, n 29; 580 NW2d 404 (1998); *People v Markham*, 397 Mich 530, 534-535; 245 NW2d 41 (1976).

In the civil area, the United States Supreme Court restated the criteria for determining retroactivity in *Chevron Oil Co v Huson*, 404 US 97, 106-107; 92 S Ct 349; 30 L Ed 2d 296 (1971):

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed . . . . Second, it has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." . . . Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial

inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." [Citations omitted.]

Thus, *Chevron* essentially applied the same three-part test with the addition of a threshold question: Does the decision clearly establish a new principle of law? Quoting *People v Phillips*, 416 Mich 63, 68; 330 NW2d 366 (1982), quoting *Chevron, supra*, the Michigan Supreme Court has held that "[p]rospective application of a holding is appropriate when the holding overrules settled precedent or decides an ' "issue of first impression whose resolution was not clearly foreshadowed." ' " *Lindsey v Harper Hosp*, 455 Mich 56, 68; 564 NW2d 861 (1997). The Unites States Supreme Court has also stated that there is no distinction between civil and criminal litigation with respect to general retroactivity principles. *Linkletter, supra* at 627. The three-part test has been applied in Michigan to civil matters, including matters involving the WDCA. See *Riley v Northland Geriatric Center (After Remand)*, 431 Mich 632, 645-646; 433 NW2d 787 (1988) (GRIFFIN, J., joined by RILEY, C.J., and LEVIN, J.).[35]

### (3) THE GENERAL RULE OF RETROACTIVITY

Regardless, however, of whether the subject matter is criminal or civil, the general rule is that judicial decisions are to be given full retroactive effect, *Lindsey, supra* at 68, and that "[c]omplete prospective application has generally been limited to decisions which overrule clear and uncontradicted case law," *Hyde v Univ of Michigan Bd of Regents*, 426 Mich

---

[35] I note, however, that there was no majority opinion in *Riley*.

223, 240; 393 NW2d 847 (1986). If a judicial decision is "unexpected" and "indefensible" in light of the law existing at the time of the underlying facts, retroactive application of that decision is problematic. *People v Doyle*, 451 Mich 93, 104; 545 NW2d 627 (1996). Indeed, where injustice might result from full retroactivity, the Michigan Supreme Court has given holdings limited retroactive or prospective effect. *Lindsey, supra*. This flexibility is intended to accomplish the maximum of justice under varied circumstances. *Tebo v Havlik*, 418 Mich 350, 360; 343 NW2d 181 (1984) (BRICKLEY, J., joined by CAVANAGH and BOYLE, JJ.), citing *Williams v Detroit*, 364 Mich 231, 265-266; 111 NW2d 1 (1961).[36] At the other end of the spectrum, however, complete prospective application has generally been limited to decisions that overrule clear and uncontradicted case law. *Tebo, supra* at 361-363.

### B. APPLICATION OF THE *CHEVRON* TEST

At the outset, it is important to understand the issue to which the *Chevron* test is to be applied. As noted above, the fund contends, whether by accident or design, that it reduced Lincoln's weekly benefit rate because of the "unambiguous holding of *Lopez*" to twenty-five percent of the state's average weekly wage, and thereafter maintained his weekly benefit rate at that amount annually "in reliance upon MCL 418.356(3); MSA 17.237(356)(3)." Simply put, the fund did not, and could not, reduce Lincoln's differen-

---

[36] See also *Parker v Port Huron Hosp*, 361 Mich 1, 28; 105 NW2d 1 (1960) (applying the decision "[i]n the interests of justice and fairness . . . to the instant case and to all future causes of action arising after . . . the date of the filing of this opinion"); *Bricker v Green*, 313 Mich 218, 236; 21 NW2d 105 (1946) (applying the decision "so far as pending and future cases are concerned").

tial benefits in reliance on a holding in *Lopez* relating
to subsection 356(3). *Lopez* dealt *solely* with the sub-
section 357(1) age sixty-five reduction provisions and
there was no mention *whatever* in *Lopez* of the inter-
play between subsection 351(2) and subsection
356(3). Rather, this issue was decided in *Wozniak I*.[37]

Therefore, the issue before us is whether the hold-
ing in *Wozniak I* (that subsection 351[2] applies to
totally and permanently disabled workers whose date
of injury preceded July 1, 1968, and establishes a min-
imum benefit rate of fifty percent of the state average
weekly wage, or the benefit rate in effect on the
effective date of subsection 351[2], January 1, 1982,
whichever is greater), should be applied retroactively
to Lincoln and others similarly situated whose differ-
ential benefits the fund reduced below these levels.

In my view, the application of the three-part test to
this question is unnecessary, for the simple reason
that the fund cannot advance beyond the threshold
question posed in *Chevron:* does the decision in ques-
tion clearly establish a new principle of law? Under
*Lindsey, supra,*[38] as applied to this case, we are to
resolve this issue by examining two subsidiary ques-

---

[37] In fairness to the fund, it may have conflated the two issues because
of the imprecision of the language in the Supreme Court's remand in this
case referring to "those who did not object to the reduction in benefits
made pursuant to [*Lopez*]."

[38] See also *Phillips, supra* at 68, articulating the standard as follows:

Before any question of the retroactive application of an appellate
decision arises, it must be clear that the decision announces a new
principle of law. A rule of law is *new* for purposes of resolving the
question of its retroactive application in the sense addressed in
*Linkletter* . . . either when an established precedent is overruled or
when an issue of first impression is decided which was not adum-
brated by any earlier appellate decision. [Emphasis in the original.]

tions: Did the holding in *Wozniak I* (1) overrule settled precedent or (2) decide an issue of first impression whose resolution was not clearly foreshadowed? If the answer to either of these questions is yes, then—and only then—should we apply the three-part test and examine the issue of reliance by the fund.

In my view, however, the answer to both of these questions is clearly no. There was no settled precedent concerning the interplay between subsection 351(2) and subsection 356(3) before the decision in *Wozniak I*. While the fund may have relied upon its own interpretation of subsection 356(3) to reduce Lincoln's weekly benefits, it could not have relied upon a decision of this or any other court to do so. Indeed, as Lincoln points out, the bureau and the WCAC have repeatedly rejected the fund's efforts to persuade them that subsection 356(3), rather than subsection 351(2), covered Lincoln and others similarly situated. When viewed in this light, the fund's argument that we should honor its "long-standing administrative practice" is unpersuasive. At best, as argued by Lincoln, the fund is confronted here by a problem very much of its own making. Before *Wozniak I*, there was no settled precedent concerning the interplay between subsection 351(2) and subsection 356(3) and the fund's argument to the contrary is more than a little disingenuous.

Having said that, it is also clear that *Wozniak I* dealt with an issue of first impression. I am not persuaded, however, that this alone defeats full retroactive application. As the Michigan Supreme Court noted in *Lindsey, supra* at 68-69, quoting *Jahner v Dep't of Corrections*, 197 Mich App 111, 114; 495 NW2d 168 (1992):

"The fact that a decision may involve an issue of first impression does not in and of itself justify giving it prospective application where the decision does not announce a new rule of law or change existing law, but merely gives an interpretation that has not previously been the subject of an appellate court decision."

See also *Lindsey, supra* at 68.

Simply put, this issue here is not the type of first impression question that supports prospective application. As the *Wozniak I* panel found, subsection 351(2) is quite specific while subsection 356(3) is quite general. Because the two subsections were once part of the same amendatory act, the legislative intent was manifestly clear: subsection 351(2) established a minimum benefit rate of fifty percent of the state average weekly wage, or the benefit rate in effect on December 31, 1969, whichever is greater, for totally and permanently disabled workers, such as Lincoln, whose date of injury preceded July 1, 1968. The fund's internal and purely administrative determination to the contrary was in error and its persistent reliance on that determination was without support in the WDCA. Applying Blackstone's formulation, the interpretation of the WDCA in *Wozniak I* was always the "true law" and it must therefore be given full retroactive effect.

V. CONCLUSION

I readily concede that the desire to do economic and social justice should be universal. I further concede that this desire permeates the WDCA and the interpretations of it by the courts. Indeed, in *King, supra*, that desire virtually dictated the outcome of the case. Nevertheless, I must observe that what may

be one judge's compassion may well be the next judge's caprice.

Therefore, while I concur with the result that the majority has reached in this case, I cannot agree that the basis for applying *Wozniak I* retroactively should be that the fund, rather than elderly, disabled workers, is better able to bear the economic consequences of its actions. Rather, I believe, we should resolve the retroactivity-prospectivity dilemma by applying the well-established rule of law regarding retroactive or prospective application of judicial decisions. In doing so, we discover and declare the law rather than make it. Because, in my view, *Wozniak I* did not "establish a new principle of law," as prior case law has interpreted that phrase, I agree that we should give it full retroactive effect.